[Crim. No. 15151. Fourth Dist., Div. One. July 5, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ALAN K. WITTIG et al., Defendants and Appellants.

COUNSEL

Christopher J. Schatz, Lightner & Castro and Michael D. McGlinn for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Jay M. Bloom and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—Alan K. Wittig and Charles V. Bailey were convicted of assault with a deadly weapon (Pen. Code[1], § 245) and found to have used a firearm in the commission of the offense (§ 12022.5). Both defendants were also convicted of maliciously and wilfully discharging a firearm at an occupied motor vehicle (§ 246). Bailey in addition was found guilty of unlawful use of force and violence upon the person of another and infliction of serious bodily injury (§§ 242/243) and to have used a firearm in the commission of the offense (§ 12022.5). Both defendants were granted pro-

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

bation for three years on condition they serve ninety days local time, pay restitution in an amount to be later determined, possess no firearm, and violate no laws excepting minor traffic offenses. On this joint appeal of their convictions, Wittig and Bailey contend the trial court erred in refusing to give requested instructions on the right of a police officer to apprehend an individual who had committed a violent felony against their person or against another, and in failing to give certain other instructions on request or *sua sponte*. The contentions are without merit.

FACTS[2]

*Prosecution Evidence*

On December 21, 1981, Mark Steffen, age 23, and Michael Moller, age 21, went dancing at Flannigan's nightclub. At about 1:30 a.m., the pair left the nightclub for Roberto's Taco Stand, located at the corner of Washington Street and Third Avenue in San Diego. They parked on Washington Street directly in front of Roberto's and ate at one of the tables in front of the taco stand.

Four men approached the taco stand, put a six-pack of beer on a table and ordered food. One or two of the men were drinking beer and making wisecracks. They were loud, but not annoying.

Steffen and Moller finished eating, threw away their trash and crossed the sidewalk to their car. Before they started the engine, someone shouted: "Faggots, get the hell out of here," and similar epithets. The young men looked around and saw four men near the order window, facing the pair's car and pointing at them. Neither Steffen nor Moller had talked to the four men or seen them before. One member of the quartet, Wittig, pointed directly at the two and yelled "faggot." Wittig did comedian Steve Martin's King Tut dance, a pseudo-Egyptian style routine, then "flipped [Steffen and Moller] off."

Moller rolled down his window and said: "Why the name-calling? Why are you shouting at us?" One of the four men replied: "I thought I told you to get the hell out of here." Moller said: "There is no reason to call us any names, we're about to leave, you know, please don't call us anything, there is no reason for that." The four men continued calling names. As Moller rolled down his window, Steffen got out of the car to clear the air. He later

---

[2]As required by long-standing rules of appellate practice, we review the evidence in the light most favorable to the judgments. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 562 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

testified he frequents Roberto's (Moller lives three blocks away) and had he not resolved the situation, he feared running into the men again. Steffen had no intention to fight, but took a can of mace (concealed behind his left leg) to protect himself if the men started a fight. Moller also testified he did not intend to fight and did not feel he and Steffen could "take" the four men in a fight.

In reply to "You ugly fucker, get out of here," Steffen said "You are ugly too, you fucker." With this exception, the young men used no profanity. When Moller also got out of the car, the four men walked toward them and formed a half-circle around them. Moller and Steffen backed up against the car. Bailey was in front of Steffen and Wittig was closest to Moller. Someone said "Look, the big boy's got some mace," and lunged at Steffen. Steffen kicked out his left leg to keep the man away. No contact was made, but the men got angry. One man grabbed Steffen's throat and put him in a headlock so he could not breathe. Steffen thought his life was in danger and wanted to use the mace but when he stuck it out in front of him, someone hit the cap off.

Steffen tried to push away the arm of the man who had him in the head-lock, but Bailey and two other men punched Steffen in the neck, face and shoulders. He pleaded: "Please, please, I give up, it is not fair three against one. I don't want to fight." The three men continued to hit him and one said: "I'm going to kill you." Steffen was not hitting back.

The punches kept coming; Steffen fell headlong into his car through the open passenger door. He crawled over to the driver's seat on his hands and knees, but could not find the car keys. Two men opened the car doors and tried to hit him with their fists. The man on the driver's side kicked Steffen in the stomach and chest. Steffen slouched over to protect his stomach. Finally, they stopped the attack.

Steffen looked for but could not see Moller. He found the keys in his jacket and drove into Roberto's parking lot to look for Moller. He became nauseous and pulled into the first parking stall.

Moller had not been spared in the fight. Wittig had thrown a punch at him. Moller dodged it, and punched Wittig in the face. Wittig swung again and Moller again dodged it, saying, "I don't want to fight," but Wittig kept coming. Moller hit Wittig again, wrestled him to the ground and tried to pin him down to stop the fight. By this time, the two were out in the middle of Washington Street.

Wittig swung an object at Moller who took it away from him. One of the other men (later identified as Nolan) came and kicked Moller in the side

causing him to fall off Wittig. As this happened, Wittig's jacket opened, exposing a gun. Moller said, "Can we cool it?" Wittig, now off the ground said, "I'm going to kill you." He reached for his gun as Moller stood defenseless. Moller ran south looking for a hiding place.

Moller then heard five to six shots. He ran up University Avenue toward Fifth Avenue, stopped a cab, and asked the driver to drive him back to the taco stand. Moller showed the driver the object he had taken from Wittig's hand during the fight. It was a clip of bullets. Moller returned to Roberto's, just as the police arrived. Moller handed the bullets to an officer.

As Steffen sat in his car in Roberto's lot, he saw Wittig and the three other brawlers come around the corner. Steffen thought the four men were planning another assault, so he started the car, intending to leave the lot. Wittig raised his arms, shouted something Steffen could not understand and ran toward the car. Steffen saw a gun protruding on the right side of Wittig's belt. He believed Wittig might use the gun against him. Steffen started to drive out of the lot to avoid further contact. With the car in first gear, it began to move forward; Wittig was then about 10 feet away. Wittig continued running toward the car. Steffen swerved left to avoid hitting him,[3] looked to Washington Street and turned onto the street.

As Steffen drove down Washington Street, he heard thumping noises and thought someone was throwing bottles at his car. He continued looking ahead but then saw the passenger window was shattered. He turned right on Third Avenue. While in the process of making the right turn, Steffen felt a warm sensation in his arm. He lost control of the car and hit a passing car on its left side. Steffen's car stalled and he heard more gunfire.

As Steffen tried to start up the car, its front windshield shattered. He heard two more shots after the collision. When the car started, Steffen headed for the hospital. His wheel fell off two blocks south of the collision, however. He got out of the car, laid down on the sidewalk and cried for help.

Witness Mochrie (a passenger in the car with which Steffen collided) heard gunfire before and after the collision. She saw Wittig against the curb on Third Avenue with his gun "outstretched, shooting." He was not wearing his glasses.[4] Smoke and sparks flew from the gun and she ducked because she was afraid of being shot.

---

[3]Steffen testified he was not aware the right fender of the vehicle had hit Wittig until he read a newspaper account of the incident.

[4]Wittig testified on cross-examination he always wears glasses at work and on the firing range. He is nearsighted. He admitted shooting at the car without glasses.

Police Officer Sykes was immediately on the scene. He contacted Wittig and Bailey and asked if they were armed. Both were. They said, "We're deputies," and pulled out badges to show the officer. Sykes took a .45 semi-automatic pistol from Wittig and a .357 magnum from Bailey. Each gun had one live round. Officer Sykes retrieved six fired .45 casings from the scene.[5] A minimum of five bullets entered the vehicle. The bullet that hit Mark Steffen was fired by the magnum.

Defendants' testimony was they had worked at the county jail as deputy sheriffs until 11:45 p.m. The defendants and two others went drinking at the Carousel Bar. They left for Roberto's at about 2:00 a.m. "Remarks" or "sounds" were made by one or more of civilian-dressed deputies, so Steffen and Moller exited the Volkswagen and "made some kind of challenging remarks." Steffen kicked Bailey and an altercation broke out. When the fight was over, Wittig saw his bullet clip had been "stolen" and approached Steffen's parked Volkswagen in "a fairly rapid, determined pace." Steffen revved up the Volkswagen and drove straight ahead into Wittig.

Bailey fired on the vehicle. Wittig stood up, went to the intersection of Washington Street and Third Avenue and fired at the departing vehicle. One of the other off-duty deputies said to Wittig: "Put the gun down, you idiot."

Bailey testified the car intentionally hit Wittig. He thought it ran over Wittig's head and chest and it came within two feet of hitting Bailey himself. Because he was taught at the academy to shoot the driver to stop a car, Bailey shot five times at Steffen as he jumped out of Steffen's way.

*Morse, one of the two off-duty deputies with defendants, never saw Bailey fire from a head-on position.* Bailey was on the sidewalk shooting from a standing firing position a couple of feet to the rear of the vehicle when its passenger window was shattered. The holes in the side of the car appeared after it was fully in the street.

Bailey testified: "Being a police officer, I don't see how I coulda done anything different." Defendants never announced to Steffen they were law enforcement officers and did not attempt to make arrests at the scene.

Wittig testified he fired six shots at the vehicle as it accelerated away. He did so because he thought Bailey had been hit by the car and was under it. He shot not only to protect Bailey but because Steffen had committed a

---

[5]Magnum casings remain inside the cylinder when the gun is fired, casings are ejected from a .45 semi-automatic.

forcible felony—assault with a deadly weapon—and Steffen was still in possession of the deadly weapon as he drove off.

The People introduced rebuttal evidence from Detective Thwing who interviewed Wittig on the morning of December 22, 1981, at the police station. *Wittig said he was not threatened by the person driving away,* but thought he might come back. *He did not say he shot because he feared for Bailey's safety.*

## DISCUSSION

### I

Wittig and Bailey contend they were deprived of a crucial defense—police officer status as justification for their actions—because the court refused to instruct the jury on the right of a police officer to prevent a forcible and atrocious felony and to apprehend someone who has just committed a crime. The following instructions were requested and refused: "Public officers are under a special duty at all times, including the time when they are not officially at work, to use their best efforts *to apprehend persons who are in the course of committing crimes.* A Deputy Sheriff is a public officer."

*"A peace officer may use deadly force to prevent a forcible and atrocious felony* which threatens death or serious bodily harm to the officer or another, or when special circumstances reasonably create fear of death or serious bodily harm to the officer or another." No instructions were requested as to principles applicable to use of deadly force to stop a fleeing felon.

The court should instruct the jury on every theory of defendant's case, but only to the extent that each is supported by substantial evidence. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1].) A requested instruction " 'must be given where evidence exists on that issue [citations].' " (*People* v. *Tucciarone* (1982) 137 Cal.App.3d 701, 707 [187 Cal.Rptr. 159].) It should not be given where no evidence exists on the issue. Defendants have cited no case and pointed to no evidence which supports the proposition their requested instructions were warranted by the factual situation presented to the jury.

The first requested instruction was taken from the case of *People* v. *Derby* (1960) 177 Cal.App.2d 626, 631 [2 Cal.Rptr. 401], where the appellate court noted: " '. . . "Public Officers such as policemen, constables, etc.,

are under a special duty at all times, because of the nature of their employment, to use their best efforts to apprehend criminals. . . ." ' "

*Derby* factually involved California highway patrolmen who were in uniform, wearing gun belts and badges. They were about to go off duty when they heard the sounds of a fight and intervened. The question presented was whether these officers were peace officers entitled to arrest and require submission by the disputing parties, in light of their primary duty which was to enforce the provisions of the Vehicle Code. In short, were these officers, in intervening in the fight, engaged in performing a duty of their office? The court answered in the affirmative. *Derby* is patently not factually nor legally in point. The *Derby* officers were uniformed, on duty. The question was as to the *scope* of the duty of a highway patrol officer.

█ Defendants were not entitled to the *Derby*-derived instruction because there was *no evidence* from their conduct, words, or the surrounding circumstances (as there was in *Derby*), Wittig and Bailey were acting as "public officers" in brawling, hazing, and in shooting wildly, blindly, down a public street at a young man they had just gang-assaulted. The defendants were not in uniform, they were not on duty, they never displayed their badges, they never announced or claimed official status before they opened fire. There was absolutely no evidence the defendants were acting in any capacity other than as private citizens, hazing and brawling when they shot at Steffen. There was only the defendants' late-in-trial declarations of *subjective intent* to act as police officers while in the process of shooting at the departing automobile. This late attempt to build an evidentiary base for a claim of justification fails miserably, because it is devoid of any evidence of acting in the capacity of police officers. Defendants' occupation therefore created no jury question. The *Derby* instruction was properly refused for lack of any substantial evidence.

Furthermore, the instruction is in fact not a correct statement of the law. The Supreme Court, for example, has carved out an exception to *Derby*'s general statement the peace officer may at any time exercise authority as an officer to apprehend criminals. In *People* v. *Corey* (1978) 21 Cal.3d 738 [147 Cal.Rptr. 639, 581 P.2d 644], the Supreme Court held enhanced (felony) punishments (§ 243) for battery of a peace officer engaged in performance of duties do not apply where the peace officer is assaulted in the course and scope of his *private employment* as a security guard. The Supreme Court said: "We do not suggest that a peace officer's official duties *necessarily* cease at the end of his normal working hours [citation to the *Derby* case] where there are no private contractual duties of the nature involved herein." (*Id.* at p. 746, italics added.)

Similarly, in *Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579 [156 Cal.Rptr. 198, 595 P.2d 975], the Supreme Court held a police officer in making arrests for shoplifting while working as a private security guard for Penney's during his off-duty hours was performing private rather than official duties. The court said: "It is thus the fact of private employment which operates to prevent a peace officer from acting in what would otherwise be his official capacity." (*Id.* at p. 588.) A felony conviction was therefore precluded under section 243.

The second requested instruction mirrors policies and procedures section 8.1.2 of the San Diego County Sheriff's Department Manual, which provides in pertinent part: "It is the policy of the San Diego County Sheriff's Department to resort to the use of a firearm, under the law, when it appears to be reasonably necessary and generally:

". . . . . . . . . . . . . . . . . . . . . . .

"4. When [the officer] has probable cause to believe that it is necessary *to prevent a crime in which human life is in serious jeopardy as a result of a suspect's actions;* or

"5. *To apprehend a fleeing felony suspect when the officer has probable cause to believe that the fleeing suspect presents an immediate or imminent threat of violence, serious injury, or death to other persons.*" (Italics added.)

In *Long Beach Police Officers Assn.* v. *City of Long Beach* (1976) 61 Cal.App.3d 364 [132 Cal.Rptr. 348], the court, in discussing similar police regulations, held: "[I]n this day and age *neither an officer nor a private person may rely on the literal language of the 1872 code provisions which appear to justify the use of deadly force to effect an arrest for, or to prevent the commission of, any felony. In view of the great expansion of crimes which have been made felonies, the courts have held that deadly force may be used against the felony suspect only if the felony is a 'forcible and atrocious' one, which threatens death or great bodily harm.* [Citations.]" (*Id.* at pp. 373-374, italics added.)

In *People* v. *Ceballos* (1974) 12 Cal.3d 470, 479 [116 Cal.Rptr. 233, 526 P.2d 241], the Supreme Court held the use of deadly force *to prevent the commission of a felony* to be unauthorized where the character and manner of the offense does not reasonably create *a fear of death or serious bodily harm.* (To the same effect, see *Kortum* v. *Alkire* (1977) 69 Cal.App.3d 325 [138 Cal.Rptr. 26]; *People* v. *Piorkowski* (1974) 41 Cal.App.3d 324 [115

Cal.Rptr. 830]; *People* v. *Jones* (1961) 191 Cal.App.2d 478 [12 Cal.Rptr. 777].)

 Defendants' requested instruction, in stating "deadly force [is permissible] to prevent a forcible and atrocious felony which threatens death or serious bodily harm," was a correct statement of the law. Here again, however, no facts were presented to warrant giving the instruction. Assuming arguendo Steffen committed an assault on the officers with his vehicle that rose to the level of a "forcible and atrocious felony," defendants cannot, in light of their own testimony, argue they shot at Steffen *to prevent* this serious felony. The felony, if there was one, had already occurred, and defendants admitted there was no indication it was likely to recur at the time they began shooting. The evidence is clear Steffen was driving down Washington Street, *away from the officers,* when the firing began. Additionally, the record shows the shooting continued even after Steffen turned onto Third Avenue and collided with another car. The second requested instruction was also properly refused; no evidence warranted its being given.

## II

 Defendants next contend, in reliance upon *People* v. *Flannel, supra,* 25 Cal.3d 668, they were entitled to a *sua sponte* instruction to the effect if they held an honest but unreasonable belief their lives were in danger, the element of malice necessary to sustain the conviction for assault with a deadly weapon was negated. *Flannel* declares an honest but unreasonable belief in the need to defend oneself from imminent peril to life or great bodily injury is inconsistent with *the element of malice necessary to sustain a murder conviction and reduces the offense to manslaughter.* (*Id.* at p. 680.)

But is there a *sua sponte* duty to instruct on this "unreasonable belief" principle in an assault with a deadly weapon context? *Flannel* says: "[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts." (*Id.* at p. 683.) *Flannel* holds the duty to instruct *sua sponte* applies to general principles of law, " '*commonly* or closely and openly connected with the facts of the case before the court.' " (*Id* at p. 681.) *Flannel* concluded, given the *absence of precedent* for requiring the instruction at issue there, *the trial court was not required to present the proposition to the jury sua sponte.* (*Id.* at pp. 681-682.)

Here, as in *Flannel,* there is a total absence of precedent for giving the proposed instruction *sua sponte.* More significantly, this case does not in-

volve that multi-faceted Pandora's box—the issue of malice. The question here is not of malice in the murder versus manslaughter context, but of a specific intent to assault with a deadly weapon. The jury was fully and adequately instructed on this requirement.

## III

■ Defendants, citing *People* v. *Sanchez* (1947) 30 Cal.2d 560 [184 P.2d 673], contend it was prejudicial error to refuse instructions they were entitled to an acquittal if the evidence of self-defense was sufficient to raise a reasonable doubt. The following instructions were requested and refused: "In this case the defendant Wittig is claiming that his conduct in the shooting is justified by his right to defend another. It is not necessary for the defendant Wittig to establish defense of another by evidence sufficient to satisfy the jury the defense of another was true. If the evidence is sufficient to raise reasonable doubt as to whether the defendant Wittig was so justified, then he is entitled to an acquittal.

"It is not necessary for the defendant Bailey to establish self-defense by evidence sufficient to satisfy the jury that the defense was true. If the evidence is sufficient to raise a reasonable doubt as to whether the defendant Bailey was justified, then he is entitled to an acquittal." The Attorney General concedes, in light of *People* v. *Adrian* (1982) 135 Cal.App.3d 335, 341-342 [185 Cal.Rptr. 506], the trial court erroneously refused the profferred instructions. The error, however, was harmless.

The trial court here, in defining each of the charges, instructed with CALJIC No. 2.90, which explained each element of each charged offense had to be proved beyond a reasonable doubt. The court then expressly enumerated each element. To convict of each crime charged, the court instructed, the jury must find defendants guilty of the *unlawful* application of force. The court also instructed with CALJIC No. 2.01, which expresses the prosecution's burden of persuasion in evidentiary terms, stating in pertinent part: "[B]efore an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt." All of these instructions, coupled with substantive self-defense instructions read to the jury (which stated each defendant was justified in defending himself from attack using all reasonable necessary force, including deadly force), adequately pinpointed the defendants' theory of self-defense. They informed the jury defendants must be found innocent, not to have engaged in the *unlawful* application of force, a necessary element of the charged crimes, *if they were found to have been engaged in self-defense.* They also instructed it was the prosecution's burden to negate

the claimed self-defense beyond a reasonable doubt. (See *People* v. *Adrian, supra,* 135 Cal.App.3d 335, 341.)

## IV

Wittig independently argues for reversal on several additional grounds. ▌ He first contends the trial court had a *sua sponte* duty to instruct on a citizen's right to apprehend a felon. As Wittig presented absolutely no evidence his shooting blindly down a public thoroughfare was in an attempt to apprehend a person he perceived to be a felon, no such instruction was warranted, either on request or *sua sponte.* Neither defendant attempted to apprehend or arrest Moller or Steffen once Steffen's car was disabled. Wittig testified after he stopped shooting, he holstered his weapon and walked to the order window to ask if the police had been called. Bailey testified after he heard the sound of a collision, he moved toward Third Avenue to view the accident. He assumed Steffen's Volkswagen was involved. He made no attempt to apprehend the driver as a "fleeing felon." It is improper to give instructions which have no applications to the facts at issue. (*People* v. *Saddler,* 24 Cal.3d 671.) It was not ineffective assistance of counsel for Wittig's trial attorney not to request the instruction.

Wittig next contends the court should not have instructed with CALJIC No. 5.54,[6] the instruction regarding self-defense by an aggressor, without instructing also with CALJIC No. 5.31,[7] the instruction regarding assault with fists, which Wittig did not request. Wittig argued at trial CALJIC No. 5.54 erroneously shifted the burden to him of proving his actions justified in self-defense. Wittig contends he lost the status of "assailant" and Steffen assumed this status, as a matter of law, when Steffen attempted to assault him with his Volkswagen. Therefore, Wittig argues, the instruction was completely inapplicable.

Whether Wittig shot at Steffen in self-defense could only be determined by a jury in light of the entire "continuum of events beginning with the confrontation [with the young men] alongside the car," just as the trial court suggested in ruling CALJIC No. 5.54 was appropriate. The court properly gave the instruction.

---

[6]CALJIC No. 5.54 provides in pertinent part: "The right of self-defense is not immediately available to a person who was originally an assailant, but such person must really and in good faith endeavor to decline further combat and fairly and clearly inform his adversary of his desire for peace and that he has abandoned the contest."

[7]CALJIC No. 5.31 provides: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes and a reasonable person in the same or similar circumstances would believe that the assault is likely to inflict great bodily injury upon him."

No error resulted from the court's refusal to give CALJIC No. 5.31 *sua sponte*. The court gave CALJIC No. 5.30[8] which adequately informed the jury all *reasonably necessary force* used to defend oneself from attack is lawful. CALJIC No. 5.30, therefore, covered CALJIC No. 5.31 in substance. Moreover, the factual picture does not justify the giving of CALJIC No. 5.31.

Finally, Wittig contends he has been subjected to double punishment in violation of section 654, in receiving concurrent sentences for assault with a deadly weapon and shooting at an occupied vehicle. Imposition of sentence was suspended; each defendant was granted probation as to each offense. Because sentence was not imposed on either defendant, there is no double punishment issue. The section 654 issue should be presented to a court upon any future attempt to impose a double punishment upon either of these defendants in the event of a probation violation.

The judgments are affirmed.

Brown (Gerald), P. J., and Work, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 27, 1984.

---

[8]CALJIC No. 5.30 provides: "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."