[No. H002957. Sixth Dist. Feb. 9, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO GONZALES MARTINEZ, Defendant and Appellant.

**COUNSEL**

Jerome McGuire, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Blair W. Hoffman and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

PREMO, J.—This is an appeal from a judgment following conviction in the Santa Clara County Superior Court. Appellant was charged with felony driving under the influence of alcohol with the enhancement of causing injury to Louie Barrientos, Vehicle Code section 23153, subdivision (a) (count I); hit-and-run driving with injury, Vehicle Code section 20001 (count II); and driving on a suspended license with a prior, Vehicle Code section 14601.1, subdivision (a) (count III). In addition, three prior felony convictions were alleged: assault with a deadly weapon (Pen. Code, § 245, subd. (a)), possession of drugs (Health & Saf. Code, § 11350), and escape (Pen. Code, § 4532).

Appellant filed *in limine* motions: to dismiss for destruction of evidence (denied); for a jury instruction directing an inference in appellant's favor

because of the destruction of evidence (denied); to exclude the victim's identification of appellant (denied); and to exclude the photo identification card (denied).

The jury convicted appellant of driving under the influence with the injury enhancement, and hit-and-run with injury. The charge of driving on a suspended license with a prior was dismissed pursuant to Penal Code section 1118.1. The assault prior was stricken, and the drug possession and escape priors were excluded for impeachment purposes, and bifurcated for trial. Appellant admitted them after the verdict on the charges.

### APPELLANT'S CONTENTIONS

Appellant complains (1) that the court erroneously gave CALJIC No. 2.52, the flight instruction; (2) that the release and destruction of the car violated *Hitch/Trombetta* standards; (3) that because of this, he was entitled to an instruction allowing the jury to draw an inference in his favor under *People* v. *Zamora, post*; (4) that the photo identification was impermissibly suggestive and that it irreparably tainted the in-court identifications; (5) that the court should have given his special eyewitness identification instruction; (6) that the prosecutor committed misconduct in filing count III, commenting on it in opening statement, and then failing to prove it; and (7) that the cumulative effect of the errors requires reversal.

### FACTS

On August 1, 1986, at 9:45 p.m., Danny Barrientos and his 11-year-old nephew Louie were driving along Senter Road near Nordale Avenue in San Jose. Barrientos saw an oncoming car with the silhouette of two occupants which swerved twice over the double yellow center lines. Barrientos began to slow down, and when the car came into his lane and headed straight toward him, he hit the brakes leaving skid marks. The car, apparently making a left turn, hit him on the center right-hand side and spun his car around. The front was pushed back toward the passenger door. Barrientos pulled Louie out through the driver's door, turned to go toward the other car, and saw somebody getting out of the driver's door. That car, a mid-sized dark blue compact, was totalled also.

Barrientos and the other driver walked toward each other. The other driver was swerving left and right as he approached, and was uttering profanities in Spanish. His speech was slurred. When he got as close as eight feet, he turned and ran. Barrientos saw him for about 20 to 30 seconds.

There was a street light about 20 feet from the collision, and the headlights of both cars were on. Barrientos was bruised and shaken up, as was

Louie, who was upset and crying. Barrientos walked over to the blue car and saw the second person, Mr. Perez, bleeding on the floorboard.

Police arrived. Barrientos described the other driver as about six feet tall, 180-185 pounds, with a dark blue jeans jacket and dark pants, a dark pullover T-shirt, a dark-colored baseball cap or beanie without a rim, and black work-type shoes like a mechanic wears with metal on the front to protect the toes. He was dark-complected with a full beard, mustache, and sideburns, and had hair that came out from under the beanie.

Barrientos and Louie were taken to San Jose Hospital. While he was there, and less than an hour after the accident, a policeman showed him two check-cashing card photographs. Both were in color and both were head-shots. Both showed dark-complected men. One was clean-shaven and had average length hair. The second, appellant, had a full mustache and beard. Barrientos looked at both for a total of 15 to 20 seconds and, referring to the bearded man, said, "This is the picture of the person."

The police officer then confided that that photograph had been found in a wallet in the blue car. This was reassuring to Barrientos, and made him feel more certain about his identification, although, as he testified, "I knew who the person was already, before I even saw the photograph."

Both defense and prosecution extensively examined Barrientos on the effect his viewing the photograph had on his recollection of the driver. Admitting that the photograph helped him make the identification and made him more certain of its correctness, Barrientos also insisted: "I could, . . . like I said before, identify with or without the photograph," and, "As far as it helping, all I could really say is that it kind of reassures you of saying, well, this is the person I saw, this is the person I have picture on mind [sic], and this picture just reassures that—he is the correct person." And although Barrientos did not testify previously to detailed facial characteristics, he said, "I still have those things in my mind. I just did not describe it because I was not asked those questions." Agreeing with the defense that "were it not for looking at the photograph . . . those detailed facial characteristics would be lost," he also agreed with the prosecution that if he only had his observations of appellant at the scene of the collision, and if he had never been shown a photograph of any sort, he "would have recognized him today here in the courtroom."

Barrientos's recollection of the identification was in some conflict with that of two officers on the scene. Officer Smith testified at trial that he made a cursory search of the blue car at the scene and had found a wallet containing a photo identification card. (He did not search for other evidence, such

as blood, fiber, etc.) He impounded the blue car because in cases of hit-and-run, *the car is always impounded as evidence of the crime.* After he searched the blue car, he spoke to Barrientos about the other driver. He agreed he had testified at preliminary hearing a month after the accident that he thought Barrientos told him that he got hit and spun around and tossed around and *never really saw the other driver,* but cautioned that his testimony was straight from memory because he never wrote anything down. He had spoken to Officer Hansen about it after preliminary hearing and had had second thoughts. "I may have made a mistake in my earlier testimony in that I may have gotten it confused with possibly one of the other accidents I've handled since then. However, at the time . . . I thought that's what he told me."

Karen Claxton, a police recruit at the time of the incident, testified that she and Officer Tibbett were dispatched to investigate a robbery reported by a friend of appellant's at 11:15 that same evening. When they arrived a couple of minutes later, she observed appellant, a Hispanic male, lying on some apartment steps, clutching his head and his hip. He had blood on his head and his right ear was cut. He wore no belt on his pants, so she could see bruising on his right hip. He was wearing dark jeans, a plaid shirt, white tennis shoes, and a baseball cap. She did not recall if he had facial hair. She did not recall if the shirt or the cap had blood stains. (The shirt, in evidence, did not. The cap was not seized for evidence.)

Although he was Spanish-speaking and she used the friend to translate, she could tell that his speech was slurred and broken. He only responded to some questions put to him, and when he did not, he would clutch his head or hip as if he were in pain. He had a strong odor of alcohol about his person, and could not stand or walk without assistance. He could not perform the field sobriety tests. She felt he became irate and uncooperative.

He said some people hit him over the head while he was in his car, and took it. He could not give a description of the assailants. She did not remember his complaining of any other property being taken. He gave the location of the robbery, but he did not know which way the robbers went.

She knew that a collision had taken place three to four miles from the apartment around 10:30 p.m. The car that appellant described was similar to the car involved in the hit-and-run. Having decided that "a robbery just couldn't have happened," neither she nor Officer Tibbett went to the robbery location, nor did either do any other investigation. After about 20 minutes, when "we believed that he could be the suspect in the . . . hit and run," Officer Tibbett got a Spanish-speaking officer to interpret. He was not used to investigate the robbery complaint.

Appellant was arrested and was taken to Valley Medical Center where his injuries were treated and blood was drawn. When he was booked, he had no wallet, money, or keys in his possession. Counsel stipulated at trial that at 20 minutes after midnight on August 2, 1986, a blood sample was drawn from appellant, and that it was found to contain a blood-alcohol level of .11 percent. A criminalist testified as to levels of impairment at various blood-alcohol levels, and to the rate of absorption.

At a motion *in limine,* Officer Juardo, court liaison officer in charge of follow-up investigation in the case, testified that the blue car was released from impound on August 14, and a notice was sent to the registered owners (not appellant). Miss Morris, an employee of the towing company which had a storage lien, testified that on September 16, she sent notice of the proposed sale to the registered and legal owners (not appellant), and did not send notice to appellant or his attorney. On October 20 or sometime thereafter, the car was picked up by the wrecking yard which had bought it and it was presumably destroyed.

## DISCUSSION

### I. *The Flight Instruction*

■■■ Appellant claims that the court erred by instructing the jury according to CALJIC No. 2.52, the flight instruction.[1] Appellant contends that where the defendant does not dispute that the elements of the crime are established, but denies that he was responsible, instructing that flight is relevant to prove consciousness of guilt does not aid the jury. Since the jury is not being asked to determine the mental state of a person admittedly present at the commission of the crime, but is asked to determine if it was the defendant who was there, the mental state of the person who fled is irrelevant.

Respondent claims that the flight instruction is mandated by statute (Pen. Code, § 1127c), and that case law authorizes it whenever there is evidence of flight, whether or not identity is the sole issue.

In the instant case, appellant did not testify at the trial. His story came into evidence through the testimony of police recruit Karen Claxton, who was dispatched to investigate his robbery report. From the statement appel-

---

[1] CALJIC No. 2.52 reads: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

lant gave to her, one may conclude that he was never at the hit-and-run scene, and that his wallet and the car got there through the agency of robbers.

He does not dispute that the driver was intoxicated, that the driver had a collision causing injury, or that the driver left the scene without identifying himself, giving aid, or performing other duties required by law. What appellant does bring into issue, and what he vigorously argued to the jury, was that he was not the driver. Therefore, he contends, the driver's consciousness of guilt should not be attributed to him, a person who was three to four miles away, minding his own business, and reporting a robbery when he was arrested.

This court addressed the flight instruction issue at some length in *People v. London* (1988) 206 Cal.App.3d 896, 903 [254 Cal.Rptr. 59]. There, we said: "To be sure, if identity is the *only* issue in a case, evidence of flight is irrelevant and the instruction is improper. [Citation.] The reason is clear. Flight supports an inference that the actor was conscious of guilt. [Citation.] But that a certain person was observed fleeing from, say, the scene of a robbery and thereby manifested a consciousness of guilt is of no consequence unless the person fleeing was the defendant." (*Ibid.*)

Appellant relies on *People v. Anjell* (1979) 100 Cal.App.3d 189, 199 [160 Cal.Rptr. 669], for the dictum that "[t]he fact that the perpetrators fled the scene of the crime cannot warrant an instruction on flight where identity is a contested issue." In our analysis of *Anjell,* we observed that the issue was the sufficiency of the evidence of flight to support the instruction, not whether the issue of identity made the instruction improper. (*London, supra,* 206 Cal.App.3d at p. 9.) We agreed with *People v. Cowger* (1988) 202 Cal.App.3d 1066 [249 Cal.Rptr. 240], in finding *Anjell*'s dictum overbroad and rejecting it, deciding that even when identity is in issue, on occasion, the flight instruction is proper. However, the real issue before us in this case, as in *Anjell,* is the sufficiency of the evidence to support the flight instruction. And on that issue, with these facts, *Anjell* is apropos.

In *Anjell,* a defendant accused of two robberies on the same day presented an alibi defense. The flight instruction was given based on three pieces of evidence: the robbers had fled the scenes of the crimes; the defendant had made statements to a witness that he felt like leaving town and mentioned going to Mexico; and a witness testified that defendant's wife told him she and defendant were moving away to get better employment.

The court found that these grounds did not justify the flight instruction. In rejecting the defendant's statement as evidence of flight, the court said

there was no evidence that he had actually left the jurisdiction, and "more than mere idle words or thoughts" was required. (*Anjell, supra,* 100 Cal.App.3d at p. 201.) Appellant's wife's statement was an inadmissible hearsay statement and there was no evidence he had actually gone away. (*Ibid.*) And the evidence that the robbers had left the scene "is of no assistance to a jury where the defendant does not dispute that all elements of the crime were present but denies that he was the robber. This is true because the instruction becomes relevant only if the sole contested issue in the case—the defendant's identity as the robber—is assumed. Even if the robber's flight tends to show his (the robber's) guilt, this is immaterial unless the jury believes that the defendant is the robber. If such is the case, there is no need to 'connect' him with the crime any further." (*Id.* at p. 200.)

In the instant case, the evidence of flight consists of Barrientos's testimony that the driver ran. The mere fact that appellant was arrested at a different place and time from the scene of the crime, standing alone, is not evidence of flight that may support an inference of guilt. (*People* v. *Watson* (1977) 75 Cal.App.3d 384, 403 [142 Cal.Rptr. 134].) ■ As this court said in *People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1095 [246 Cal.Rptr. 406], evidence "merely that the perpetrator fled from the immediate scene of the crime is deemed immaterial in establishing the identity of the perpetrator."

■ In this case, it is undisputed that there was a hit-and-run accident, that someone was injured, and that the driver was under the influence of alcohol. "The sole contention made by the defendant was that he was not the perpetrator. Thus, the question left for the jury to decide was whether the defendant was the perpetrator of the crime. Once the jury found the defendant was the perpetrator, the case against him ended for all practical purposes. The only factual issue was the identity of the perpetrator who fled the scene. The flight instruction added nothing to this determination. . . . The court erred in the instant case by giving the flight instruction." (*People* v. *Parrish* (1986) 185 Cal.App.3d 942, 948 [230 Cal.Rptr. 118].)

■ However, where it is not reasonably probable that a result more favorable to appellant would have been reached if the instruction had been omitted, reversal is not required. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Anjell, supra,* 100 Cal.App.3d at pp. 201-202.) ■ The record herein shows ample evidence supporting the conviction. Barrientos's testimony in court identified appellant and did not conflict with the description he gave before he saw the photographs. Appellant's wallet and identification were found in the blue car at the scene. When appellant was arrested shortly after the accident, he was intoxicated

to a degree which was consistent with the condition of the driver. Appellant had injuries that were consistent with his being the driver. The shirt he was wearing was not bloody, which was consistent with his not having worn it at the time the injuries were sustained. Finally, although appellant gave an explanation of sorts, it apparently was rejected by the jury. A more favorable result is not reasonably probable.

## II. *Disposition of Evidence*

 Appellant complains that the car contained evidence which could have been exculpatory, and that release of the car by the police was a wrongful failure to preserve the evidence.

In the motion *in limine,* testimony showed that the car was seized as evidence and cursorily searched at the scene where the wallet and identification were found, then impounded. Following proper statutory procedures, the police department later notified the registered and legal owners (not appellant) that the vehicle was to be released. The same owners were later notified of the impending sale to a wrecking yard. No response was received, and the car was sold. Notice of the release and the intended sale were not given to appellant or his attorney.

Appellant requested the sanction of a jury instruction (authorized by *People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]) allowing an inference to be drawn that the evidence would have been favorable to the defendant. The trial court found that appellant did not make a showing of materiality under *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], and refused the requested instruction.

 In *Trombetta,* the United States Supreme Court held that "[t]o meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (467 U.S. at p. 489 [81 L.Ed.2d at p. 422].) Appellant urges this court to find that this rule did not abrogate the ruling in *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], and to apply the *Hitch* rule in this case.

In *Hitch,* the California Supreme Court held that if there is a reasonable probability that evidence is favorable to the defense, due process requires its disclosure. When such evidence cannot be disclosed because of its intentional but nonmalicious destruction by investigative officials, sanctions should be imposed unless the prosecution could show that the governmental agencies involved established, enforced, and attempted in good faith to

adhere to rigorous and systematic procedures designed to preserve the evidence. (12 Cal.3d at pp. 652-653.)

Appellant asserts that the *Hitch* rule of materiality of evidence is based on the California Constitution, and is therefore a doctrine of independent force and effect from that of *Trombetta,* which is a federal due process rule.

We disagree with appellant. The Supreme Court in *In re Michael L.* (1985) 39 Cal.3d 81, 85-86 [216 Cal.Rptr. 140, 702 P.2d 222], concludes that *Hitch* states a requirement for the preservation of evidence under the federal guaranty of due process, and finds it unnecessary to reach the question whether *Hitch* "survived" *Trombetta.* Having concluded that *Hitch* is founded on federal law, "[i]t is well established that *Trombetta,* a subsequent federal decision, is the current version of the standard regarding access to evidence." (*People* v. *Epps* (1986) 182 Cal.App.3d 1102, 1115 [227 Cal.Rptr. 625].)

Recently, the United States Supreme Court, in *Arizona* v. *Youngblood* (1988) 488 U.S. 51, 57 [102 L.Ed.2d 281, 289, 109 S.Ct. 333, 337], dealt with the failure of the state to preserve evidentiary material "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." The court refused to impose a duty on police to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution. The court held that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

■ Appellant asserts that at the motion *in limine* at which evidence was taken regarding the disposal of the blue car, he made a sufficient showing to satisfy the *Trombetta* rule, namely, that the evidence (the blue car) both possessed an exculpatory value that was apparent before the evidence was destroyed, and was of such a nature that the defendant would be unable to obtain comparable evidence by reasonably available means. (*People* v. *Melton* (1988) 44 Cal.3d 713, 750 [244 Cal.Rptr. 867, 750 P.2d 741].) He further implies that this court should find bad faith because the police knew from the beginning of his claim that the car had been stolen. Since they had custody of the car, they should have promptly searched it and properly stored any evidence it did contain.

The trial court rightfully rejected appellant's *Trombetta* assertion. An officer, looking at a car that was left at the scene of a hit-and-run accident, would not find readily apparent any exculpatory value in the vehicle. Even knowing of a suspect's claim that the car was stolen from him, and even

accepting the possibility that some evidence, such as the fingerprints of the thief, might be available inside the car, it is too tenuous to suppose that such fingerprints would have exculpatory value. For one thing, it would be impossible, from the fact of fingerprints themselves, to tell when and under what circumstances they were placed in the vehicle. Even assuming that it would be possible to identify the owner of the fingerprints, and assuming even further that this person would fit the description given by Barrientos of the hit-and-run driver and that this person could be placed at the scene, the officers who failed to preserve the car could not possibly have prophesied such an outcome. Since the exculpatory value is not readily apparent, under this prong alone, appellant failed to meet the *Trombetta* standard.

Furthermore, there is nothing in the record to show bad faith. A comparison of these facts to those of *Youngblood* shows that in both cases police collected evidence, stored it, and eventually destroyed it. In *Youngblood,* police collected a rectal swab and clothing on the night of the crime, and seized defendant's car later, when he was apprehended. The swab was refrigerated but the clothing was not. The car was eventually destroyed without police checking out defendant's contentions about the condition of his car, which, if true, would have differed substantially from the victim's description of the car, and would have constituted exonerating evidence. The semen stains found some time later on the clothing were useless for testing because of improper storage.

In the instant case, police knew appellant's assertion that the car had been stolen, and could see that he was bleeding. No steps were taken to search the car for fingerprints or bloodstains. The car was released and destroyed.

This is not evidence of bad faith. As in *Youngblood,* there was no showing that police acted contrary to accepted procedures. No attempt was made to conceal the evidence from appellant. He had been provided with police reports which showed the whereabouts of the car. He had access to the evidence for inspection or testing. If he needed time, he could have notified the police department and sought a preservation order from the court. As it was, the car was not released for some weeks after it was seized. Appellant's inaction cannot be used as evidence of bad faith on the part of the police. Therefore, this failure to preserve the evidence did not deny him due process of law.

By deciding that appellant did not show the materiality of the evidence under *Trombetta,* and finding no evidence of bad faith under *Youngblood,* we have no need to discuss the propriety of an instruction under *Zamora, supra,* 28 Cal.3d 88.

### III. *The Photo Identification*

■ Appellant contends that Barrientos's in-court identification was tainted by the officers' handling of the investigation at the scene. He objects to their searching the blue car at the scene in Barrientos's presence, to their showing him the photo identification card, and to their telling him that it had come from the blue car.

■ A single-photo showup may be suggestive and unnecessary but if, under the totality of the circumstances, the evidence is reliable, it may be admitted. (See *Manson* v. *Brathwaite* (1977) 432 U.S. 98 [53 L.Ed.2d 140, 97 S.Ct. 2243]; *In re Cindy E.* (1978) 83 Cal.App.3d 393 [147 Cal.Rptr. 812].) The factors to be considered include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. (*Manson* v. *Brathwaite, supra,* at p. 114 [53 L.Ed.2d at p. 154].)

Prompt identification of a suspect who has been apprehended close to the time and place of the offense to exonerate the innocent and aid in discovering the guilty is a valid purpose for conducting a one-person showup (*People* v. *Irvin* (1968) 264 Cal.App.2d 747, 759 [70 Cal.Rptr. 892]), and is likely to be more accurate than a belated identification days or weeks later (*People* v. *Odom* (1980) 108 Cal.App.3d 100 [166 Cal.Rptr. 283]).

In numerous cases, courts have scrutinized the facts underlying an identification. Courts have considered whether the witness had sufficient time to look at the suspect (*People* v. *York* (1980) 108 Cal.App.3d 779, 786 [166 Cal.Rptr. 717] [one witness for three minutes and another, less than one minute]); whether there was sufficient light (*People* v. *Kilpatrick* (1980) 105 Cal.App.3d 401, 412 [164 Cal.Rptr. 349], disapproved on other grounds in *People* v. *Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927]); the distance between the witness and the suspect, and whether the confrontation took place within a relatively short time (*People* v. *Gomez* (1976) 63 Cal.App.3d 328, 336 [133 Cal.Rptr. 731] [several feet and within 1½ to 2 hours]); and whether the persons who conduct the identification procedure make no suggestions, intentionally or unintentionally, that they expect the witness to identify the accused (*Moore* v. *Illinois* (1977) 434 U.S. 220, 224-225 [54 L.Ed.2d 424, 431, 98 S.Ct. 458]).

■ In the instant case, victim Barrientos and Officers Smith and Hansen testified at a motion *in limine* regarding the photo identification. Bar-

rientos testified to seeing two photographs, and picking one. He had a 20- to 30-second opportunity to observe the other driver, with lighting provided by the headlights of both cars and a streetlight. He looked him in the face as they approached each other, and he continued to watch as the driver ran. He gave a description of the driver as to clothing, hair, complexion, facial hair, height, weight, and condition of intoxication. It was not suggested at trial that appellant did not conform to that description. Barrientos viewed the photographs at the hospital, where, although he had been shaken up, he was not seriously hurt. There was no evidence that his injuries impaired his abilities either to observe or recall. Upon seeing the photographs, within an hour of the accident, Barrientos was certain of the identification. He testified that his identification in court was based on his observations of the driver at the scene, and not on the photograph or his observations in court at any of the hearings that had taken place.

The trial court, with the benefit of observing the demeanor of the witnesses, found that there was no suggestive procedure which would taint the in-court identification, and that it was a product of Barrientos's recollection.

■ "The trial court's determination that the process was fair (and) complied with due process will be sustained on appeal if supported by substantial evidence. . . . [¶] ■ When the charge of unfairness in the showup confrontation is made, the burden is on the complaining defendant to establish the facts supporting a conclusion of unfairness and [that] the confrontation resulted in such unfairness as to give rise to a substantial likelihood of misidentification . . . ." (*People* v. *York, supra,* 108 Cal.App.3d at pp. 786-787, citations omitted.) ■ Appellant has failed to show that the photographic identification process in any way tainted the in-court identification.

## IV. *The Eyewitness Identification Instructions*

At trial, appellant requested an extensive instruction focusing the attention of the jury upon factors related to the reliability of eyewitness identification.[2] The court rejected the proposed instruction, except for paragraph

[2] Appellant's requested instruction read: "Eye witness testimony has been received in this trial for the purpose of identifying the defendant as the person who committed the crimes charged. The law recognizes that eyewitness identification is not always reliable, and that cases of mistaken identity have been known to occur. You should therefore view eyewitness identification testimony with caution, and evaluate it carefully in light of the factors I shall discuss.

"Many factors can affect the accuracy of eyewitness identification. In determining the weight to be given the eyewitness identification testimony in this case, you should first consider the factors I have previously mentioned that may affect the testimony of all witnesses gen-

6, which was given as: "Whether the witness was able to identify the alleged perpetrator in a photographic lineup; if so, were the photographs suggestive in any way," and gave CALJIC Nos. 2.91 and 2.92.[3]

---

erally. But you should also consider other factors that may particularly affect eyewitness identification testimony. Among the more important factors to consider are the following:

"1. Was the witness' capacity to observe the offender impaired by injury?

"2. Was the witness already familiar with the offender, or were they strangers? In general, people are better at identifying persons they already know than persons with whom they have had no previous contact.

"3. Were the witness and the offender of different races? Studies show that when the witness and the person he is identifying are of different races, the identification tends to be less reliable than if both persons are of the same race.

"4. Did the witness give a description of the offender immediately after the alleged crime? If so, how well does the defendant fit that description.

"5. Was the witness's memory affected by intervening time and events? Memory tends to fade over time. And studies show that a witness may subconsciously incorporate into his memory information from other sources, such as descriptions by other witnesses.

"6. Did the witness identify the defendant before trial either from photographs or in a lineup? If so, were the photographs or the lineup suggestive in any way? An identification from a lineup tends to be more reliable than an identification from photographs. And an identification made when the witness views the defendant in a group of people of similar appearance tends to be more reliable than when he views the defendant alone.

"I remind you that no single factor determines the reliability of an eyewitness identification. The presence of one or more factors in a particular case may offset the effect of others. In weighing the identification testimony of an eyewitness, you should therefore evaluate all the relevant evidence, both positive and negative, that may bear on the accuracy of that testimony."

[3] CALJIC No. 2.91 read, as given: "The burden is on the state to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. [¶] If, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether the defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

CALJIC No. 2.92, as given and with appellant's request added, read: "Eye witness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eye witness identification testimony, you should consider the believability of the eye witness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including, but not limited to, any of the following: [¶] The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; [¶] The stress, if any, to which the witness was subjected at the time of the observation; [¶] The witness's ability, following the observation, to provide a description of the perpetrator of the act; [¶] The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; [¶] The cross racial or ethnic nature of the identification; [¶] The witness's capacity to make an identification; [¶] Whether the witness was able to identify the alleged perpetrator in a photographic line-up; if so, were the photographs suggestive in any way? [¶] The period of time between the alleged criminal act and the witness's identification; [¶] Whether the witness had prior contacts with the alleged perpetrator; [¶] The extent to which the witness is either certain or uncertain of the identification; [¶] Whether the witness's identification is in fact the product of his own recollection; [¶] Any other evidence relating to the witness's ability to make an identification."

Appellant originally based his requested instruction on *People v. Wright* (1987) 43 Cal.3d 399 [233 Cal.Rptr. 89, 729 P.2d 280] (rehg. granted March 26, 1987, sub. opn. *People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049]). ▇▇▇ Basing his argument on authorities preceding the original opinion in *Wright (I), supra,* 43 Cal.3d 399, appellant contends that he was entitled to his proposed instruction which related eyewitness identification to reasonable doubt (*People v. West* (1983) 139 Cal.App.3d 606, 609 [189 Cal.Rptr. 36]), and which modified a flawed instruction (*People v. Aho* (1984) 152 Cal.App.3d 658, 663 [199 Cal.Rptr. 671]; *People v. Coates* (1984) 152 Cal.App.3d 665, 671 [199 Cal.Rptr. 675]).

Appellant points to the fact the jury requested rereading of the time of the accident, the times of the report and response to the robbery complaint, and the description of appellant by Recruit Claxton, as persuasive evidence that the identification issue was a close question, and therefore worthy of his more focused instruction.

▇▇▇ "When the jury is properly instructed as to pertinent legal principles, the court need not restate those principles merely in another way." (*People v. Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366]; *People v. Frye* (1985) 166 Cal.App.3d 941, 951-952 [213 Cal.Rptr. 319].) ▇▇▇ Where the issues raised by proposed defense instructions are covered by CALJIC Nos. 2.91 and 2.92, refusal to give the instruction tendered by the defense is not error. (See *People v. Martinez* (1987) 191 Cal.App.3d 1372, 1379-1380 [237 Cal.Rptr. 219].)

▇▇▇ Appellant's requested jury instruction covered essentially the same factors covered by the court, with three additions: First, he requested an instruction on whether Barrientos's capacity to observe was affected by his injury; second, whether his memory was affected by intervening time and events; and third, he requested a cautionary charge ("You should . . . view eye witness identification testimony with caution").

More importantly, appellant's proposed instruction also incorporated purported accepted truths as a matter of law: "In general, people are better at identifying persons they already know than persons with whom they have had no previous contact. [¶] . . . Studies show that when the witness and the person he is identifying are of different races, the identification tends to be less reliable . . . . [¶] [ ] [S]tudies show that a witness may subconsciously incorporate into his memory information from other sources, such as descriptions by other witnesses."

▇▇▇ The Supreme Court in *People v. Wright (II), supra,* 45 Cal.3d at page 1141, held that "a proper instruction on eyewitness identification

factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed. . . . An instruction that 'explained' the influence of the various psychological factors would of necessity adopt the views of certain experts and incorporate the results of certain psychological studies while discounting others. It would require the trial judge to endorse, and require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications. Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge."

As appellant correctly noted, in *People* v. *McDonald* (1984) 37 Cal.3d 351, 363–369 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], the Supreme Court authorized expert testimony on scientific and psychological evidence as to factors believed relevant to an evaluation of eyewitness identifications. In *Wright (II),* the court noted that both parties may call such witnesses, questioning can focus on factors most relevant to the particular circumstances of the case, and cross-examination can reveal the weaknesses in their testimony and theories as well as the underlying assumptions on which their conclusions are based. (45 Cal.3d at p. 1142.)

"We conclude that the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and that an explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate. The instruction should list the applicable factors in a neutral and nonargumentative instruction, thus effectively informing the jury without improperly invading the domain of either jury or expert witness." (45 Cal.3d at p. 1143, fn. omitted.)

In the instant case, there was no evidence in the record, either from Barrientos himself or from experts, that Barrientos's injuries impaired his ability to observe. Nor was there evidence of studies on eyewitness identification which would support the proposed instructions even if they were not argumentative. An instruction should not be given where no evidence exists on the issue. (*People* v. *Wittig* (1984) 158 Cal.App.3d 124, 131 [204 Cal.Rptr. 378].)

Furthermore, the cautionary instruction was properly refused. "[A]n instruction stating that mistaken identification is 'not uncommon' is objectionable and may be properly rejected . . . . [¶] [ ] A special cautionary instruction is unnecessary because the 'factors' instruction already

required properly highlights the factors relevant to defendant's concerns about the reliability of eyewitness identification testimony in a particular set of circumstances. [¶] The additional general cautionary instruction . . . would produce redundancies which could unbalance the jury's deliberative process. Singling out a category of evidence for special consideration may cause the jury to give it undue weight in its deliberations. The cautionary instruction given along with the factors instruction would place unwarranted emphasis on the eyewitness identification, and likely give the jury the improper impression that the *court* considers the eyewitness identification evidence not only particularly important but also overwhelmingly suspect. [¶] The . . . instruction would also improperly usurp the jury's role as the exclusive trier of fact by binding it to the view that eyewitness identifications are often mistaken. . . . This is not an appropriate function of an instruction. If the defendant wishes to present to the jury information on the unreliability of eyewitness identifications under a particular set of circumstances, he must use means other than a jury instruction, such as expert testimony. [Citation.] . . . [E]xpert testimony has the advantage of being subject to cross-examination and rebuttal, thus allowing the jury to determine for itself the weight it should give to expert opinions, rather than binding the jury to accept certain experts' views." (*Wright II, supra,* 45 Cal.3d at pp. 1152-1154.)

 As noted above, the identification was accompanied by a number of corroborative factors. Furthermore, defense counsel conducted a vigorous examination of identification witnesses, and forcefully argued the unreliability of eyewitness identification. She quoted from the United States Supreme Court.[4] The issue was well presented to the jury. "[T]he vehicles of cross-examination, argument and instructions relating to the facts of this case, highlighted the psychological factors and unreliability of eyewitness identifications and focused the jury's attention on the issue. These vehicles, particularly cross-examination, could swiftly disabuse the jury of misconceptions it had about the reliability of eyewitness identification." (*People* v. *Plasencia* (1985) 168 Cal.App.3d 546, 556 [223 Cal.Rptr. 786], fn. omitted; accord, *People* v. *Jackson* (1985) 164 Cal.App.3d 224, 247 [210 Cal.Rptr. 680].) The jury was properly instructed.

### V. *Prosecutorial Misconduct*

 ██ █ Appellant asserts that the prosecutor committed misconduct by charging appellant with driving on a suspended license with a prior conviction of that charge, by commenting on the charge in her opening statement, and by offering documentary proof that was

---

[4] *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926].

unaccompanied by evidence that appellant was the person specified in the documents.[5] Appellant claims this prejudiced him by placing in front of the jury information that it could use as evidence of bad character.

Appellant did not request a curative instruction from the court. ▪ "When a defendant complains of prosecutorial misconduct for the first time on appeal we must ask if a timely objection and admonition would have cured the harm. If so, the contention must be rejected; if not, then we must reach the issue whether on the entire record there was such prejudice to cause a miscarriage of justice." (*People* v. *Rios* (1985) 163 Cal.App.3d 852, 868 [210 Cal.Rptr. 271].) Failure to object when an admonition would cure the harm waives the issue. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 860-861 [180 Cal.Rptr. 640, 640 P.2d 776].)

▪ Here, the court granted a motion under Penal Code section 1118.1 to dismiss count III, told the jury, and explained that the verdict form would only contain two counts. The court then discussed a previously submitted note from a juror inquiring about the absent Mr. Perez, and immediately said: "[T]here is no reason to speculate why something happened or why something didn't happen. As fact finders you have to decide the case based upon the evidence presented to you. There is an instruction that I will read to you which indicates neither side has the burden or responsibility to call all witnesses . . . or present all documents that might be involved." Although this is not exactly an admonition directly on point, it did inform the jury that it was not to speculate, and that it was to decide the case based on facts in evidence. Furthermore, the jury had been instructed at the outset that the jury was not to consider as evidence any statement by the attorneys. "If that admonition was inadequate, appellant should have requested an additional explanation or admonition." (*People* v. *Maese* (1980) 105 Cal.App.3d 710, 719 [164 Cal.Rptr. 485].) Whatever harm there was could have been cured by appropriate admonition. Appellant waived the issue and it is not reasonably probable that appellant would have received a more favorable result if the prosecution had not made the statement at issue.

---

[5] The prosecutor presented documentary evidence which was admissible. It was only in the absence of evidence to link the defendant to the documents that the court granted a motion to dismiss that count. Where it is apparent that at the outset of the case the prosecutor believed the evidence admissible, that such evidence was later excluded does not establish bad faith. (*People* v. *Havenstein* (1970) 4 Cal.App.3d 710, 714 [84 Cal.Rptr. 528].) Only where the evidence was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted" are remarks made in an opening statement to evidence later excluded considered misconduct. (*People* v. *Ney* (1965) 238 Cal.App.2d 785, 793 [48 Cal.Rptr. 265].)

### CONCLUSION

The judgment is affirmed.

Capaccioli, Acting P. J., and Cottle, J., concurred.

A petition for a rehearing was denied March 2, 1989, and appellant's petition for review by the Supreme Court was denied May 3, 1989.