Filed 3/28/13  P. v. Moore CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM ANDREW MOORE,<br><br>    Defendant and Appellant. | A134245<br><br>(Alameda County<br>Super. Ct. No. H50854) |

Appellant William Andrew Moore challenges his conviction for second degree robbery (Pen. Code, § 211) following a jury trial.[1]  He argues the trial court erred in failing to exclude evidence he had purchased a BB gun the day before the robbery.  He also contends trial counsel provided ineffective assistance by failing to object to evidence the victim identified him in a single-person "showup," to hearsay testimony regarding the amount of money stolen, and to prosecutorial misconduct during closing arguments.  We find no prejudicial error and affirm.

---

[1]  On November 15, 2011, the court sentenced appellant to the upper term of five years in state prison.  As appellant was on probation when he was arrested, the trial court conducted a probation violation hearing concurrently with the trial.  The trial court sentenced him to two years in state prison for the probation violation, to run concurrently with the sentence imposed in this case.

FACTUAL BACKGROUND

On July 11, 2011, at approximately 4:45 a.m., a robbery occurred at the 7-Eleven on Stevenson Boulevard and Farwell Drive in Fremont.

*The Testimony of Ashok Nagpal*

The clerk working in the store at the time of the robbery, Ashok Nagpal, testified at trial as follows:[2] He was alone in the store making coffee when he heard the bell indicating someone had entered the store. He looked back and saw a man, who "looked like a Mexican," wearing a long-sleeved black T-shirt with a short-sleeved brown T-shirt over it, black pants, and a small black cap. The man wore a black cloth over his face that covered his nose and mouth and hung down below his chin; as a result, Nagpal could see only the man's eyes, which were "black and brown." The man had a black glove on his left hand and a paper bag covering his right hand. The man directed Nagpal to go to the cash register. Once Nagpal was there, the man told him to open the cash register and gestured with his left hand for Nagpal to step aside, while pointing the bag-covered hand at him. Nagpal never saw what was under the bag but thought it was a "pistol" or a "knife" and feared for his life. When Nagpal opened the cash register, appellant grabbed the cash from the drawer with his gloved left hand, took two packs of American Spirit Black Cigarettes from behind the counter, and walked out of the store. In court, Nagpal identified appellant as the man who robbed him on July 11.

After appellant left the store, Nagpal pushed an alarm button to summon police, and called them by telephone. Officers, including a Punjabi-speaking officer, responded to the store.

When Nagpal counted the money in the cash register at the end of his shift at 5:30 a.m., he determined that $129 had been taken, "[b]ecause the computer was showing [a] deficit."

---

[2] Nagpal, who said he "know[s] a little bit" of English, testified through a Punjabi interpreter.

2

Shortly after coming on duty at 8:00 a.m., City of Fremont Police Officer Barry Fowlie was briefed about the 7-Eleven robbery, and was given a description of the suspect. Around 9:00 a.m. Fowlie was dispatched to a Best Western hotel about one mile from the 7-Eleven regarding a "suspicious person," who was sleeping in the lobby and refusing to leave. When he entered the hotel lobby, he saw appellant reclined in a chair, apparently sleeping. Appellant was wearing black pants and a black T-shirt. Fowlie did not see a brown T-shirt on or near appellant. Fowlie approached appellant and nudged him in an attempt to wake him. At this point, Fowlie noticed a black knit cap and black gloves in appellant's lap, and "a metallic point sticking out of the right pocket of [appellant's] pants," which he believed to be an ice pick. Fowlie took the hat and gloves, which were ultimately booked into evidence, and removed an ice pick from appellant's pocket. After several attempts, Fowlie was able to wake appellant, who gave his name to Fowlie. Shortly thereafter, Fowlie arrested appellant for possession of the ice pick and conducted a patdown search incident to the arrest. The search revealed a "wad of cash" in appellant's front pocket.

Suspecting appellant might have been involved in the robbery at the 7-Eleven, Fowlie called City of Fremont Police Detective Michael Gebhardt, and Gebhardt met Fowlie and appellant at the police station. During a more thorough search of appellant at the police station, Fowlie recovered an open pack of American Spirit cigarettes in appellant's back pocket.[3] Gebhardt, who was searching appellant concurrently, removed other items from his person.

*Detective Gebhardt's Testimony*

Gebhardt testified that, in his presence, Fowlie searched appellant at the police station and found several items on his person: a cell phone, a sales receipt from the Big 5 Sporting Goods in Fremont, a pack of American Spirit cigarettes, an open pack of Pall

---

**3** Fowlie stated in his report that this pack of cigarettes was unopened, but testified at trial that the prosecutor later brought this error to his attention.

Mall cigarettes, and $121 in cash.**4**  Fowlie handed Gebhardt a pair of black gloves and a black cap.

At some point after the cell phone was recovered from appellant, Gebhardt looked at the text messages on it and found several from around the time of the 7-Eleven robbery. A message sent from the phone at 3:15 a.m., read "I'm hella stupid, blood. I'm a hot boy."**5**  Gebhardt testified that "hot boy" was slang for "I'm wanted by the police, I've done a crime," but acknowledged this message was sent before the robbery. Another message sent from the phone at 3:19 a.m. read "Bout to knock this clerk" followed by a "smiley-face symbol." Over a defense objection, Gebhardt testified that "knock" was slang for "rob." A third message sent at 3:21 a.m. read, "I'm on Stevenson at Blacow," a location about one-quarter mile from the 7-Eleven. Police identified the person to whom the messages were sent as Julio Villalobos, who identified himself to police as appellant's cousin.

Following the arrest and search of appellant, Gebhardt interviewed him. The interview was recorded and played for the jury.**6**  In the interview, appellant denied intending to hurt the victim and denied having a "real gun." When asked if he was sorry for what he did, appellant replied "yeah." Appellant denied spending any of the money that he got from the register. He said he was sorry and was willing to return the money and the cigarettes. He told Gebhardt, "I'm willing to give the money back. [¶] . . .

---

**4**   The testimony of Gebhardt and Fowlie differed as to when the cell phone and cash were found on appellant. Fowlie said he found the cash during his initial patdown of appellant and could not recall whether he found the cell phone during his patdown of appellant at the hotel, in the back seat of the patrol vehicle at the police department "before . . . Gebhardt came down," or in the detective area of the police station; Fowlie said he believed he "had [appellant's] cell phone and the hat and gloves and the money all together for . . . Gebhardt."

**5**   The reporter's transcript states that this message was sent at 3:50 a.m., but this appears to be a transcription error. The police report indicates that it was sent at 3:15 a.m. This is consistent with the prosecutor's apparent introduction of the messages in chronological order.

**6**   A transcript of the interview was provided to the jury as an aid in watching the video tape.

4

[¶] I'd apologize." Appellant said "I never meant to hurt anybody" and maintained he was not going to shoot the clerk. Gebhardt gave appellant a pen and paper so he could write an apology note to the clerk and left the interview room for about 30 minutes. Appellant wrote the following notes during the break in the interview: "I will not incriminate myself. I am not a bad person. I am sorry 7-11 clerk . . . as a clerk. . . . Loving life and living it. I need counseling. . . . Intelligent mind. I have lost . . . it all . . . ." Appellant admitted "I had to do it" and "I made a mistake."[7]

Around 11:00 a.m. that day, police brought Nagpal to the police station so they could conduct a showup involving appellant. Appellant was placed in a room where Nagpal could view him through the glass. Appellant did not wear a hat or cover his face during the identification procedure. Nagpal asked that appellant be moved closer. Appellant, who was standing 10 feet away, was moved two feet closer to Nagpal. Nagpal "peered forward, as if he was looking, and said, 'The eyes. The eyes are the same[.]' "[8] Nagpal also stated that the suspect and the robber were approximately the same height and weight. Gebhardt showed Nagpal the gloves and hat recovered from appellant, and Nagpal identified them as the ones the robber wore.

## DISCUSSION

We address appellant's contentions in the order raised.

I. *Evidence Regarding Appellant's Purchase of a BB Gun*

Appellant made a motion in limine below, seeking to preclude under Evidence Code section 352 any reference to his purchase of a BB gun the day before the robbery. The trial court denied the motion. Gebhardt testified at trial that he went to the Big 5

---

**7** Gebhardt testified that he used several techniques during the interview to elicit the truth from appellant. Gebhardt stated he made the following false statements to appellant: the police had audio of the robbery from the video surveillance, someone had called in to identify appellant as the robber, and the store clerk said appellant had a gun. Appellant does not contend these false statements rendered his statement involuntary.

**8** Although Nagpal had indicated to police that the robber's eyes were brown and black, Gebhardt testified at trial, based on a photo, that appellant's eye color was hazel, possibly a dark green. Nagpal testified that he recognized appellant because "[h]is eyes are deep set" and "[h]e had thick eyebrows."

5

Sporting Goods "to verify what was purchased through [the] receipt" found on appellant's person. Gebhardt said he determined the receipt was for the purchase of a Desert Eagle BB gun kit at 5:14 p.m. on July 10, 2011, the day before the robbery. Video surveillance from the Big 5 Sporting Goods, taken at that date and time, showed appellant in a black hat, black shirt, and dark-colored pants, buying a BB gun at the counter. The gun itself was never recovered, but the top portion was found on appellant's person. Gebhardt noted, with that top portion missing, the BB gun resembled a semiautomatic handgun. At trial, the prosecution introduced a photograph of the type of BB gun appellant purchased, as well as the portion of the gun found on his person.

Appellant contends the trial court erred in denying his motion to exclude this evidence. We apply a deferential abuse of discretion standard when reviewing a trial court's rulings on the admissibility of evidence. (*People v. Scott* (2011) 52 Cal.4th 452, 491 (*Scott*); *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35.) Under that standard, a trial court's ruling will not be disturbed on appeal unless the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329; *People v. Garcia* (2008) 168 Cal.App.4th 261, 275.)

In determining whether the trial court acted within its discretion in denying appellant's motion, we begin with the principle that "[n]o evidence is admissible except relevant evidence." (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.) " 'Evidence is relevant if it tends " 'logically, naturally and by reasonable inference' to establish material facts such as identity, intent, or motive." ' [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 642-643.) A trial court has discretion to exclude relevant evidence nonetheless "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence does not result in undue prejudice simply because it supports the proponent's case or damages the opponent's; undue prejudice arises only when the evidence is likely

to induce the jury to reward or punish one side due to an emotional or other reaction that is not based on a logical evaluation of the evidence in relation to the issue to which it is relevant. (*Scott*, *supra*, 52 Cal.4th at pp. 490-491.)

Appellant contends his purchase of a BB gun had no probative value to any issue in the case "[s]ince no gun was seen before, during, or after the robbery," and it is "prejudicial error to admit evidence of a weapon that is of no relevance to the issues in the case." We find no prejudicial error.

As Nagpal never testified that he saw a gun, and his belief appellant had a pistol in the paper bag was speculative, the challenged evidence is relevant only to the extent it helps identify appellant as the robber. On this issue, the evidence regarding appellant's purchase of a BB gun is, at best, marginally relevant. Even assuming, however, that the trial court erred in concluding this evidence was relevant (Evid. Code, § 351), or in failing to conclude its probative value was substantially outweighed by the danger of undue prejudice, confusing the issues, or misleading the jury (*id.*, § 352), any such error was harmless.

Under the *Watson* prejudice standard, which applies to the erroneous admission of evidence (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76), reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson* (1956) 46 Cal.2d 818, 836). Here, the evidence of appellant's guilt was overwhelming. A text message from his cell phone shortly before the robbery places him less than one-quarter mile from the 7-Eleven; in another text to his cousin, he stated his intent to "knock" (i.e., rob) a clerk. Soon after the crime, he was found only one mile from the 7-Eleven, wearing clothes similar to the robber's and holding black gloves and a distinctive cap that matched those the robber was wearing; and Nagpal subsequently identified him as the robber, during the showup and in court.[9] Finally, appellant made several damaging admissions regarding the crime in a statement to the police. Evidence that he purchased a

---

[9] We address in part II.B., *post*, appellant's challenge to these identifications and reject them.

BB gun that was never displayed during the robbery could not have played a significant role in the jury's conclusion; had the trial court excluded this evidence, it is not reasonably probable appellant would have achieved a more favorable result.**10**

II. *Defense Counsel's Alleged Ineffective Assistance*

Appellant contends he received ineffective assistance of counsel because his trial counsel failed to object to Nagpal's identification at the showup and in court, to hearsay testimony regarding the amount of money that was taken during the robbery, and to prosecutorial misconduct during closing arguments.

A. *The Legal Standard for Ineffective Assistance of Counsel Claims*

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93 (*Benavides*).) "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 690 (*Strickland*).) " 'To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an

---

**10** In so holding, we also reject appellant's contention that the admission of this evidence violated due process because it was "so irrelevant that there are no permissible inferences to be drawn from it" and was of " 'such quality as necessarily prevents a fair trial.' " Appellant maintains the evidence was "prejudicial in that it suggested to the jury . . . [he] might be the sort of person to carry a weapon . . . ." In light of the overwhelming evidence of his guilt, however, we do not agree that the risk of such an impact rendered the trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]"]; *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920 ["Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.]"].)

explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624 (*Hart*).)

"Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*Benavides*, *supra*, 35 Cal.4th at p. 93.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*Hart*, *supra*, 20 Cal.4th at p. 624.) A defendant must overcome "the strong presumption of reliability." (*Strickland*, *supra*, 466 U.S. at p. 696.) To demonstrate that counsel's failure to make a motion or raise an objection was the product of incompetence, the defendant must show that the motion or objection would have been meritorious and that there is a reasonable probability the verdict would have been different absent the excluded evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 576.)

B. *Trial Counsel's Failure to Move to Suppress Nagpal's Identifications*

Appellant argues the showup was impermissibly suggestive, and his attorney's failure to object to Nagpal's pretrial and trial identifications constituted ineffective assistance of counsel. We disagree.

The defendant bears the burden of demonstrating the identification procedures were unreliable. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*).) This question turns on " '(1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . . If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*Ibid.*; see *People v. Kennedy* (2005) 36 Cal.4th 595, 608, overruled on another point in *People v. Williams* (2010) 49 Cal.4th 405, 458-459.)

An identification procedure is unfair if it suggests to the witness that the person he is about to observe is the perpetrator. (*Ochoa*, *supra*, 19 Cal.4th at p. 413.) Relying on *People v. Sandoval* (1977) 70 Cal.App.3d 73 (*Sandoval*), appellant contends the

9

identification procedure was unduly suggestive because there was no compelling reason to conduct a single-person showup. In *Sandoval*, the court stated that a single-person showup "should not be used . . . without a 'compelling reason' [citation] because of the great danger of suggestion from 'a one-to-one viewing [which] requires only the assent of the witness' [citation]." (*Id.* at p. 85.) Here, the timing of the showup—which was conducted mere hours after the robbery and shortly after appellant's arrest—was a necessary component of the police investigation, as it allowed police to pursue other suspects in the event Nagpal exonerated appellant. (See *People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219 [prompt identification of suspects serves a legitimate purpose in quickly ruling out innocent suspects and apprehending the guilty, and such identifications are likely to be more accurate].)

In any event, as *Sandoval* makes clear, "[w]hether a single showup violated due process must be determined in the light of all the circumstances of the case. [Citations.]" (*Sandoval, supra,* 70 Cal.App.3d at p. 85.) Gebhardt testified that he gave Nagpal the standard admonition prior to conducting the showup: "I want you to take a good look at the person I'm going to show you. Don't let the fact that they're with police sway your judgment in either way. This may or may not be the person that we're looking for in the associated crime. If you recognize someone, let us know. If you don't recognize anybody, let us know. Take as much time as you need. And if there's anything that comes to mind during it, please don't be afraid to ask."[11]

Appellant contends the manner of the showup was unnecessarily suggestive, relying on Nagpal's testimony he was told by police that the robber had been taken into custody and would be brought before him. Appellant fails to note, however, that Nagpal clarified in later testimony that the police had only told him they were going to show him a person, and asked him to identify whether or not he recognized the individual as the robber. And Gebhardt denied telling Nagpal that the police had caught the person who

---

[11] Gebhardt documented the giving of the admonition in his report.

10

committed the robbery; he said he did not at any time refer to the person to be observed as "the robber."[12]

Given the propriety of the procedures employed, any motion to suppress Nagpal's pretrial identification of appellant would have lacked merit. For this reason, he has not shown defense counsel's failure to make the motion deprived him of an adjudication of a potentially meritorious defense. (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1081-1082 (*Ybarra*); see also *In re Hall* (1981) 30 Cal.3d 408, 434.) As we conclude a challenge to the showup procedure would have failed, we also reject appellant's challenge to the in-court identification, which was premised on appellant's contention the showup was improperly conducted. (*Ybarra*, at p. 1082.)

### C  *Trial Counsel's Failure to Object to Testimony Regarding the Amount of Money Taken in the Robbery*

Appellant contends Nagpal's testimony that $129 was taken from the cash register during the robbery was based on hearsay to which defense counsel failed to object, namely, the cash register computer's record of the store's sales during Nagpal's shift. Assuming, however, that this electronically stored information constitutes hearsay, no incompetence is demonstrated by counsel's failure to object to its admission. Counsel may well have concluded that Nagpal would have been able to lay an appropriate foundation for the computer's calculations under the business records exception (Evid. Code, § 1270 et seq.), or that the prosecution could have otherwise obtained evidence laying the required foundation. Nor is it reasonably probable a different result would have occurred if the trial court had excluded evidence based on the store's computerized sales records.[13] Although the similarity between the amount stolen and the amount taken from appellant's person at the time of his arrest was "[o]ne of the pieces of circumstantial

---

[12]  Although Nagpal's English was limited, Gebhardt stated, "[Nagpal] spoke enough [English] and relayed that he understood enough English that I felt we were communicating."

[13]  Our conclusion in this regard is the same, whether we consider this evidence in isolation or in conjunction with the evidence of appellant's purchase of the BB gun, discussed in part I, *ante*.

evidence linking [him] to the robbery," the other evidence of his guilt was overwhelming. (See pp. 7-8, *ante*.)

D. *Trial Counsel's Failure to Object to the Prosecutor's Misconduct*

Finally, appellant contends defense counsel provided ineffective assistance at trial by failing to object to statements by the prosecutor during his rebuttal closing argument.

Defense counsel contended during closing arguments that certain tactics used by Gebhardt while interrogating appellant rendered his statement unreliable. In rebuttal, the prosecutor countered: "[Defense counsel] has also asked, 'How can we find that statement to be reliable?' She wants me to answer that question. If that statement should not have been played to you, you can rest assured that it would never have been played. If the cops crossed the line, if they did something illegal, you would have never seen it. The judge has instructed you on the law in this case, and there's not a single thing you've heard about anything that was improper."

Appellant argues this comment was improper because it "misstated the law and vouched for the reliability of the statement and the propriety of the police conduct." Trial counsel's failure to object, he contends, fell below the standard of competent advocacy. We reject both contentions. "A prosecutor is given wide latitude during closing argument. The argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison*).) As the prosecutor never suggested he possessed information about the case in addition to the evidence produced at trial, we agree with respondent that there was no "vouching" in the prosecutor's comments. (*People v. Frye* (1998) 18 Cal.4th 894, 970-971 (*Frye*) ["so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [the prosecutor's] comments cannot be characterized as improper vouching"], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

12

Of greater concern is appellant's argument that the prosecutor's comments misstated the law and confused the jury. When a misconduct claim " 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*Harrison*, *supra*, 35 Cal.4th at p. 244.) "[T]he defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]" (*Frye*, *supra*, 18 Cal.4th at p. 970.) When "conducting this inquiry, [the appellate court] 'do[es] not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*Ibid.*)

Appellant has not made the requisite showing here. Applying the above principles, we do not agree that the jury interpreted the prosecutor's comments to mean the trial court would have excluded appellant's statement if it believed the statement was unreliable and the jury was not entitled to independently evaluate the statement's reliability. Consistent with the admonition in *Frye*, we do not lightly infer that the jury drew the most damaging meaning from the prosecutor's comments; in the narrowest reading, the prosecutor said nothing more than appellant's statement would not have been presented to the jury if the officers used illegal means to obtain it. To hold otherwise would not only violate the admonition in *Frye*, but also would ignore the concluding sentence in the quoted rebuttal, which directs the jury to the trial court's instructions. In those instructions, the court directed the jury to consider all the circumstances under which appellant's statement to Gebhardt was made, to evaluate its reliability, and to "give it the weight to which you find it to be entitled in light of all the evidence." The court's instructions also specifically permitted the jury to consider "whether [any] threats or offers of leniency affected the reliability of any statement made by [appellant]." We presume the jury followed [these] instructions. [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1047, fn. 34.)

As we conclude the prosecutor's statements did not constitute misconduct, defense counsel's failure to object to these statements did not constitute ineffective assistance.[14]

## DISPOSITION

The judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

_____

[14] We observe, in any event, that the trial court's instructions rendered any alleged missteps by the prosecutor and defense counsel nonprejudicial.