Filed 10/1/14  P. v. Higgins CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>MICHAEL ROBERT HIGGINS,<br><br>　　　　Defendant and Appellant. | F065359<br><br>(Super. Ct. No. F09903080)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Robert L.S. Angres; Mitchell Law Group, Inc., and Michael E. Mitchell for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Heather S. Gimle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Michael Robert Higgins was convicted of robbery, assault with a firearm, terrorist threats, and possession of a firearm by a felon. A number of enhancements were found true in a bifurcated proceeding.

On appeal, defendant argues the trial court erred in denying his motion for new trial based upon defense counsel's failure to suppress the store manager's identification of defendant at the in-field showup because the identification was unduly suggestive. Defendant further contends there is insufficient evidence his prior conviction for assault with a deadly weapon was a serious felony because the evidence is insufficient regarding use of a weapon. Finally, defendant maintains the trial court erred when it admitted evidence, over his hearsay objection, that he suffered a prior juvenile adjudication for robbery because the records pertaining to that adjudication are insufficient to support the finding of a serious felony. Plaintiff argues there was no ineffective assistance of counsel necessitating the trial court's grant of a motion for new trial, and the evidence pertaining to both the 1982 conviction and the 1979 juvenile adjudication is sufficient to support the serious felony findings. Plaintiff does request remand for resentencing, noting it appears the trial court meant to sentence defendant to 21 years for the enhancements rather than a period of 26 years.

We affirm. Defense counsel did not render ineffective assistance of counsel and, thus, the trial court did not err in denying defendant's motion for new trial. Further, the evidence was sufficient to support the trial court's conclusion that defendant's 1982 prior conviction for assault was a serious felony. Nor did the trial court abuse its discretion by admitting juvenile court records pertaining to a 1979 adjudication establishing a prior conviction for robbery. Finally, we will direct the trial court to prepare a corrected abstract of judgment.

2.

## BRIEF FACTUAL SUMMARY[1]

On the afternoon of May 25, 2009, a man entered a furniture store in southwest Fresno and asked the manager whether the business sold televisions. The man left the store after being told the store did not sell televisions. Very shortly thereafter, another man entered through a customer pick-up side entrance at the back of the store. The manager was on the telephone, but noted the second man's arrival. A moment or so later, the manager noticed the man stop, look toward the front of the store, and then place a nylon stocking over his face. The man was armed with a sawed-off shotgun.

The manager of the store, Richard Cazares, was then robbed at gunpoint. The suspect demanded money, physically assaulting Cazares in the process. The suspect also made a number of threats, telling Cazares he would shoot him. Cazares handed over the store's cash box. The man demanded Cazares's wallet and cell phone. Cazares handed over his wallet, but his cell phone had been damaged in the encounter.

The suspect fled the store through the same side door. Cazares, on the other hand, fled through the doors located at the front of the store, facing Olive Avenue. A California Highway Patrol (CHP) officer, Charles Cipolla, was passing the store in a marked patrol car; Cazares flagged him down and reported he had just been robbed. Looking behind him, Cazares noted the suspect and the first man who had asked about the televisions just moments prior to the robbery were in a nearby white sedan. He told the Officer Cipolla the men in the white car were the men who had robbed him, and the officer initiated a pursuit.

Meanwhile, an employee of a nearby business had witnessed two men walking toward the furniture business, then moments later running away from that business. One of the men was yelling, "Go, go, go!" The employee also observed Cazares flag down the passing CHP vehicle.

---

[1]The facts are discussed in more detail where necessary for a determination of the issues on appeal.

3.

A block or two away, the suspect vehicle stopped. Of its three occupants, the driver[2] got out and began to walk away from the scene, the front seat passenger[3] remained near the car, and the back seat passenger ran from the scene. After being taken into custody by another nearby CHP officer, defendant—the back seat passenger—was identified as the gun-wielding robbery suspect. The store's cash box, Cazares's wallet, a loaded sawed-off shotgun, and a nylon stocking were found in the back seat of the sedan belonging to defendant.

## DISCUSSION

### I.     Denial of the Motion for New Trial on the Basis of Ineffective Assistance

Defendant argues trial counsel rendered ineffective assistance by failing to move to suppress Cazares's in-field identification of defendant because the identification was unduly suggestive. Since counsel was ineffective, the trial court erred in denying defendant's motion for new trial on that basis. The People contend the decision not to challenge the identification was strategic and, thus, counsel did not render ineffective assistance. Therefore, the trial court did not abuse its discretion in denying defendant's motion for new trial.

#### A.     General Principles

It is axiomatic that a court has broad discretion when ruling on a new trial motion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, overruled in part on another ground as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151, overruled in part on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) A court's ruling will not be disturbed "'"unless a manifest and unmistakable abuse of discretion clearly appears."'" (*Guerra*, at p. 1160.)

---

[2]The driver was later identified as Alfredo Rivera.

[3]The front passenger was identified as Michael Woods, the man who had asked Cazares whether the store sold televisions.

To prevail on an ineffective assistance of counsel claim, the appellant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86–87.) The *Strickland* court explained that prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.) Further, the high court stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid*.)

A claim of ineffective assistance of counsel may be raised in a motion for new trial under Penal Code[4] section 1181, even though it is not one of the statutorily enumerated grounds. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) When the trial court has denied a motion for new trial based on an ineffective assistance claim, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence but reviewing de novo the ultimate question of whether the facts established demonstrate a violation of the right to effective counsel. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

### B.     Counsel's Testimony

At the hearing on the motion for new trial, Jeffrey Hammerschmidt, defendant's trial counsel, testified concerning his decision not to move to suppress the in-field identification of defendant by Cazares. More particularly, Hammerschmidt was asked about a certain CHP officer's testimony in coperpetrator Rivera's trial, that trial occurring a few years prior to defendant's trial:

---

[4]Further statutory references are to the Penal Code unless otherwise indicated.

"[DEFENSE COUNSEL:] Do you recall how Officer Butler in the Rivera transcript testified that [defendant] had been tasered when the police contacted him?

"[HAMMERSCHMIDT:] A Yes.

"Q Okay. And that he had been tasered in the middle of the street; correct?

"A Yes.

"Q And according to Officer Butler, they picked him up in the middle of the street and an in-field showup actually occurred at that point with the victim, Mr. Cazares?

"A Yes. My memory was that the testimony at the trial was that the pavement was hot, and that they moved him from the pavement to the—a grassy area where he was being held face down.

"Q Okay. And do you recall, according to your review of this portion of the transcript from the Rivera trial, that Officer Butler testified to pretty much the same thing?

"A Yes.

"Q And so according to Officer Butler, and your review of that transcript, the officers were securing [defendant] when the victim jumped out of the patrol car; right?

"A I don't remember the part about the victim jumping out of the patrol car, but I do remember that [defendant], according to the testimony, was forcibly being held down—um—when the in-field showup occurred by the victim.

"Q Okay. And that same information appeared in Officer Butler's testimony during the Rivera trial; right?

"A Yes.

"Q Okay. [¶] Okay. And he—the victim, Mr. Cazares, when he showed up [he] jumped out of the patrol car; correct?

"A I don't recall that. That may be right. I just remember that he ID'd [defendant] as the robber.

"Q I'm speaking to Officer Butler's testimony in the Rivera trial you had access to. On page 409 of this document that you have, according

6.

to the top of page 409, Officer Butler testified during the Rivera trial that Mr. Cazares jumped out of the patrol car and said, 'That's the MF'er'—which is for an abbreviation, I think you know what that means—'right there'?

"A  Correct.

"Q  And at that point he had just been tasered, correct, according to Officer Butler's testimony right there?

"A  I believe the transcript says that he had been tased, and then he had been moved.

"Q  Okay.

"A  He had been tased in the middle of the street and then moved to a grassy area, and then Mr. Cazares showed up and jumped out of the patrol car and made the statement you referred to earlier.

"Q  According to Officer Butler, bottom of page 408, he said, 'The victim actually showed up before they moved [defendant]'; correct?

"[PROSECUTOR]:  Your Honor, I would object to leading.

"THE COURT:  I'll allow the question.  Overruled.

"[HAMMERSCHMIDT]:  Yeah, it does state that he—that the—Mr.—that the patrol car—um—another patrol car drove Mr. Cazares and showed up before they moved him from the road to the grassy area.

"[DEFENSE COUNSEL]:  Okay.  Thank you."

On cross-examination, Hammerschmidt was questioned further regarding the in-field showup:

"[PROSECUTOR:] Q  Were you aware of the manner in which the in-field showup was conducted prior to the trial?

"A  Yes.

"Q  And was it your strategy not to file that motion?

"A  I—I made a strategic decision not to file it.

"Q  And isn't it true you did argue to the jury the manner in which the in-field showup was—the procedure for the in-field showup at the time of the trial?

7.

"A Yes. My strategy was to use that in combination of other things to show a very tainted identification.

"Q And was that part of your strategy to discredit the manner in which the police acted in this case?

"A Yes. In particular with respect to Officer Cipolla."

On redirect examination, the following testimony was given regarding trial counsel's strategy specific to the issue of defendant's identification:

"[HAMMERSCHMIDT:] A Um—due to all of the other things that were going on with the police that showed, I believe, that they did—especially Officer Cipolla, did an extremely poor job in his investigation and in his testimony, that—that that combination of events was a better way of proceeding than trying to exclude that information to show—in other words, to show that—um—it was very suggestive in the way the identification was done. They—they didn't even wait until he was stood up—um—to bring the victim to the location. So I believe that, coupled with the other evidence in combination, showed—um—sufficiently bad police work that the jury could conclude that they could not rely upon the victim's identification. There was also some other information regarding the identification that was—um—incorrect as far as the description—initial description. So it was just my strategy based on those combination of factors to not make an objection to the in-field identification.

"[DEFENSE COUNSEL:] Q However, if the Court had agreed, and this issue had been dealt with in an in limine motion, isn't it true that the identification may never have come before the jury at all?

"[PROSECUTOR]: Objection, calls for speculation.

"THE COURT: I'll allow the question.

"[HAMMERSCHMIDT]: Um—no, I—I don't believe that there would have been no identification of [defendant] at all.

"[DEFENSE COUNSEL]: Q Well, wasn't—Mr. Cazares was the only victim in the store; correct? Strike that. Mr. Cazares was the only victim in the store that was actually allegedly robbed; right?

"A Correct.

"Q So if Mr. Cazares' identification of [defendant] was ruled inadmissible, there would have been no identification of [defendant]; correct?

8.

"A I mean, I think that calls for speculation depending upon a variety of issues. I don't necessarily agree.

"Q Okay. So if the Court had ruled that in-field showup was so suggestive that it tainted his in-court identification as well, wouldn't there have also been no in-court identification of [defendant]?

"A It's possible. I don't think the ruling would have went that way but—

"Q Okay. I mean, couldn't you have raised the motion, if the ruling didn't go your way then you still could have pursued your strategy that you did pursue?

"A Yes, but that's not what I chose to do."

Further recross-examination elicited the following:

"[PROSECUTOR:] Q Going back to the identification of Mr. Cazares. The identifications made by Mr. Cazares of [defendant], you knew that prior to trial Mr. Cazares did ID [defendant] at the in-field showup; correct?

"A Yes.

"Q And you knew that he also identified Mr. Woods at the scene of the crime, or at least by [defendant]'s vehicle?

"A Yes.

"Q And you also knew that Mr. Cazares identified Mr. Rivera as the getaway driver by way of a photo lineup; is that correct?

"A Yes.

"Q You also knew that Mr. Cazares identified [defendant], Mr. Woods, and Mr. Rivera at the preliminary hearing?

"[DEFENSE COUNSEL]: At this point I'm going to object on relevance grounds.

"THE COURT: Overruled. [¶] … [¶]

"[HAMMERSCHMIDT]: Yes.

"[PROSECUTOR]: Q And you're also aware that Mr. Cazares identified Mr. Rivera at the trial involving Mr. Rivera?

"A Yes."

9.

Later, Hammerschmidt asked to add something in response to questioning. Specifically, he testified he was also aware the prosecutor could have called Rivera or Woods to testify, and he believed that testimony would have proven more damaging than Cazares's identification because both Rivera and Woods had identified defendant as having committed the armed robbery. Hammerschmidt explained he did not contact either Rivera or Woods about what they may have testified to because, having given prior statements to law enforcement, those statements would have been admitted for impeachment purposes at a minimum. Hammerschmidt believed defendant's "best chance" involved avoiding such a scenario. At trial, he had argued that law enforcement's investigation was lacking on several fronts, and he believed it was the best strategy to obtain an acquittal or a hung jury. Finally, Hammerschmidt noted that as a former prosecutor he believed the prosecutor in defendant's case would have called either Rivera or Woods to testify at trial had he moved to exclude Cazares's identification. He wanted to avoid that outcome.

### C. Analysis

From this record it is plain trial counsel had a sound strategy. With specific regard to the issue of Cazares's identification of defendant, counsel opted not to challenge the in-field showup as unduly suggestive. Not because he did not believe the circumstances were free of suggestion but, rather, because counsel believed that particular circumstance played into the totality of law enforcement actions that he argued were poorly executed and thus not reliable. Excluding that identification would have lessened the strength of counsel's argument that law enforcement actions and the investigation were lacking.

Moreover, trial counsel, an experienced member of the criminal bar, believed had he moved to exclude Cazares's identification at the in-field showup, the prosecutor would have countered by arranging for the testimony of either Rivera or Woods, at least one of whom could have been subpoenaed to testify at trial. Counsel was aware both Rivera and Woods had previously identified his client as the armed robber in statements to law enforcement. He did not need to know how either would testify at trial because if either

10.

testified contrary to the previously provided statement, that testimony would be subject to impeachment. Trial counsel reasonably believed the better course, in an effort to obtain an acquittal or hung jury for his client, was to challenge a variety of the actions taken by law enforcement.

"'"[W]e accord great deference to counsel's tactical decisions" [citation], and … "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation].'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254; accord, *People v. Weaver* (2001) 26 Cal.4th 876, 928 ["'even "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel"'"].)

Considering the underlying issue of the identification itself, we discern no error.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

Even assuming, for argument's sake, the identification procedure was unduly suggestive, Cazares's identification of defendant was not unreliable. He had sufficient opportunity to observe defendant. During the robbery, Cazares took note of the suspect's entrance via a side door at the back of the business. The man who entered the store was bald, shorter than Cazares, and had a very thick mustache. Cazares observed the man turn toward the front of the store, then turn back toward him before putting something over his head. That "something" was a very thin, light tan stocking that did little to conceal the suspect's identity; the "real thick mustache" protruded through the nylon material. The suspect then rushed at Cazares while holding a sawed-off shotgun and demanded money. He was holding the shotgun about eight to 12 inches from Cazares's face. Cazares estimated the suspect was no farther than three feet from him. He took

11.

note of the suspect's clothing as well. Cazares's attention was focused on defendant during the encounter and he accurately described defendant as he looked at the time of the robbery. (See *People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.)

Cazares was watching the suspect the entire time in the store and testified he was close enough to touch him. When ordered to his knees, Cazares begged the suspect for his life. He testified he had "no doubt" defendant was the man who had robbed him. Cazares demonstrated a significant level of certainty at the time of the identification, chasing after defendant himself and demanding the CHP officer apprehend defendant, then identifying defendant as the man who robbed him at gunpoint. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) At trial, Cazares said he "immediately kn[e]w" defendant was the robber.

Finally, there was little time between the robbery and defendant's apprehension a few blocks from the furniture store. Notably, prompt identification of a suspect close to the time and place of the offense serves a legitimate purpose in quickly ruling out innocent suspects and apprehending the guilty. (*People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219.) This type of identification is likely to be more accurate than a belated identification. (*Ibid*.)

In conclusion, trial counsel's strategy was sound. It was based upon tactical decisions and experience. He did not render ineffective assistance by failing to challenge the in-field identification of defendant as unduly suggestive. Therefore, there was no manifest or unmistakable abuse of discretion by the trial court in denying defendant's motion for new trial.

## II.     The Prior Assault Conviction as a Serious Felony

Defendant maintains there is insufficient evidence he suffered a prior conviction qualifying as a serious felony for purposes of the three strikes law (§§ 667, subd. (a), 1170.12, subd. (b)). More specifically, defendant argues the record regarding his 1982 conviction pursuant to section 245, subdivision (a) is insufficient to support the prior conviction finding because it is not clear the offense was committed with the use of a

deadly weapon, and because in 1982 the court did not make a finding regarding the related conduct enhancement (§ 12022.5).

### A.    Background

People's exhibit No. 62[5] includes a copy of an abstract of judgment dated August 30, 1982, referring to a conviction in Los Angeles Superior Court case No. A369078 for a violation of "PC 245(A) … ASLT/GBI/DLY/WEAPON … 7/27/82."

People's exhibit No. 63[6] includes a "Chronological Index of Court Proceedings" and numerous minute orders for proceedings in that same case, to wit:  Los Angeles Superior Court case No. A369078.  The July 27, 1982, minute order indicates trial had already commenced as to defendant and his codefendant.  Following a ruling by the court regarding the People's motion to declare a certain witness unavailable, outside the presence of the jurors, defendant and the codefendant indicated they wished to change their previously entered not guilty pleas to guilty.  That same date, defendant pled guilty to a violation of section 245, subdivision (a) as alleged in count 3.  The minute order also includes a notation that "Defendant personally and with counsel admits the use allegation pursuant to … Section 12022.5 in Count 3.  On People's motion the GBI allegation pursuant to … Section 12022.7 in Count 3 is stricken."  The minute order of August 24, 1982, indicates defendant was sentenced to a four-year prison term, and also includes the following:  "The Court makes no finding as to the use allegation pursuant to … Section 12022.5 in Count 3.  [¶] The Court finds circumstances in aggravation and imposes the high term as to Count 3."  Another copy of the abstract of judgment is included as well.

---

[5]The section 969b packet was received into evidence without objection.

[6]During the court trial, the prosecutor moved to admit People's exhibit No. 63, identifying the exhibit as "certified court records from the Los Angeles Superior Court from case number A369078, documenting a conviction from July 27th, 1982, for a charge of PC 245(a). The packet contains minute orders and the abstract of judgment, which I've shown to counsel." Defense counsel did not object and the exhibit was received into evidence.

13.

During the bifurcated proceedings concerning defendant's priors, testimony established defendant's fingerprints matched the fingerprint cards included in the section 969b packets proffered by the People.

Following argument on this issue, the trial court ruled as follows:

"… We have records that describe [the section 245 offense] as an ADW, we have that, but those same records also describe it, that is the abstract, describes it as GBI deadly weapon. Whereas, it's obvious from the records that the GBI was never admitted or proved. But I'm satisfied that the minute order is accurate in that it says the defendant pleads to [section] 245(a) …. That by itself doesn't satisfy me that it's an assault with a deadly weapon, but the minute order does state that he personally and with counsel admits the use allegation pursuant to [section] 12022.5 in Count 3. His admission of that use allegation is proof beyond a reasonable doubt that in fact he personally used a deadly or dangerous weapon in commission of a crime. That—whether the court sentenced him for that enhancement or not, whether the court violated the law or not when it, quote, made no findings regarding that enhancement, doesn't change the fact that he admitted it. And I'm satisfied that the records accurately reflect that admission.

"That is an assault with a deadly weapon. And it is a case or a circumstance in which the defendant personally used a deadly weapon in the commission of the offense by his admission. That, then, makes it a serious felony under [section] 1192.7(c)(23),[7] felony in which the defendant personally used a dangerous or deadly weapon by his admission. It is arguably, also, a serious felony by reason of [section] 1192.7(c)(31).[8] I'm satisfied that the admission of the [section] 12022.5 allegation is sufficient corroboration that this was an assault with a deadly weapon to justify its finding as it being a serious felony under either of those subdivisions of [section] 1192.7(c).

"I find that to be a serious felony; find that to have been committed by this defendant. It matches the 969b packet, which contains his photograph and fingerprints as testified to by [the fingerprint analyst], and

---

[7]"(c) As used in this section, 'serious felony' means … [¶] … (23) any felony in which the defendant personally used a dangerous or deadly weapon …."

[8]"(c) As used in this section, 'serious felony' means … [¶] … (31) assault with a deadly weapon, firearm, machinegun, assault weapon, or semiautomatic firearm or assault on a peace officer or firefighter, in violation of Section 245 …."

14.

consistent with my review of Exhibit 67 and the prints in that packet, Exhibit 62.

"… My job is to assess whether these records satisfy me beyond a reasonable doubt that this is either an assault with a deadly weapon under [subdivision] (c)(31), or a crime in which the defendant personally used a dangerous or deadly weapon under [subdivision] (c)(23), I think it was, and I find it to be both on these facts."

**B.     Analysis**

"On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence. In other words, we determine whether a rational trier of fact could have found that the prosecution sustained its burden of proving the elements of the sentence enhancement beyond a reasonable doubt. [Citations.]" (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067.)

To determine the nature of a prior conviction, the trier of fact may look to the entire record of the prior criminal proceeding but no further. (*People v. Trujillo* (2006) 40 Cal.4th 165, 180; *People v. Reed* (1996) 13 Cal.4th 217, 222–223, 226; *People v. Guerrero* (1988) 44 Cal.3d 343, 354–355.) This prevents the prosecution from relitigating the circumstances of a crime committed years earlier. (*People v. Trujillo*, *supra*, at p. 180; *People v. Reed*, *supra*, at p. 223.) Our Supreme Court has explained, "The reason for this limitation was to 'effectively bar[] the prosecution from relitigating the circumstances of a crime committed years ago and thereby threatening the defendant with harm akin to double jeopardy and denial of speedy trial.' [Citation.]" (*People v. Trujillo*, *supra*, at p. 180.) The rule that a trier of fact may look to the entire record of the prior conviction but no further applies to prior convictions in other jurisdictions. (*People v. Miles* (2008) 43 Cal.4th 1074, 1082; *People v. Myers* (1993) 5 Cal.4th 1193, 1201.) Typically, the prosecution may elect to prove the facts and nature of the prior conviction by introducing certified documents from the record of that conviction. (*People v. Delgado*, *supra*, 43 Cal.4th at p. 1066; *People v. Prieto* (2003) 30 Cal.4th 226, 258.) The trier of fact may then draw reasonable inferences from such records. (*Ibid*.)

15.

Significantly, a "conviction under the deadly weapon prong of section 245(a)(1) is a serious felony, but a conviction under the [great bodily injury] prong is not." (*People v. Delgado*, *supra*, 43 Cal.4th at p. 1065.)

Here, defendant acknowledges that "[t]ypically, the admission of … an enhancement by itself puts an end to the question as to how to characterize a felony; under the law it is deemed serious." He claims, however, that this is an unusual case, implying the admission should be overlooked "because the trial court back in 1982 failed to make a finding as to the conduct enhancement." This argument ignores the question presented below: whether there was proof beyond a reasonable doubt that the alleged prior was a serious felony. As stated in *Trujillo*, such a determination asks whether a prior conviction amounts to a serious felony based upon a consideration of "'"the nature of the *conviction*"'" at issue. (*People v. Trujillo*, *supra*, 40 Cal.4th at p. 179.) The nature of the conviction and the sentence imposed thereon are not one and the same. Whether the trial court made a particular finding and/or imposed sentence on the conduct enhancement does not exclusively address the nature of the conviction. Further, we do not agree the admission should be overlooked as a result.

With regard to the court's inquiry and finding that defendant's 1982 conviction for assault involved the use of a deadly weapon, we hold that finding is supported by substantial evidence.

Viewing the record in the light most favorable to the judgment reveals an abstract of judgment that uses both "deadly weapon" and "great bodily injury" language. That language, presented alone, would be insufficient to support a serious felony finding. But here there was more than simply the abstract of judgment. The record of conviction included a minute order wherein it is stated that "[d]efendant personally and with counsel" admitted to the use of a deadly weapon. Further, the record of conviction reveals the "GBI allegation" was stricken.

Unlike *People v. Banuelos* (2005) 130 Cal.App.4th 601, upon which defendant relies, the abstract of judgment in this case was not the only evidence relied upon to

16.

prove the section 245 conviction was a serious felony. The July 27, 1982, minute order resolved any ambiguity that would have otherwise resulted from a review of only the August 30, 1982, abstract of judgment. Hence, this record of conviction was sufficient to allow the trial court's rational finding that the prosecution had proven the elements of the sentence enhancement beyond a reasonable doubt. (*People v. Delgado*, *supra*, 43 Cal.4th at p. 1067.)

### III. The Prior Juvenile Adjudication as a Serious Felony

Defendant maintains the trial court abused its discretion in admitting evidence of defendant's juvenile adjudication over defense counsel's hearsay objection. He contends the juvenile court records are not certified records and, thus, the trial court erred as a matter of law by admitting the People's exhibit No. 66.

#### A. Background

People's exhibit No. 65[9] comprised certified records of the California Department of Corrections and Rehabilitation, Division of Juvenile Justice dated June 2, 2009, pertaining to defendant's 1979 juvenile adjudication. More particularly, the "Master Record" form reflects an offense of "211PC Robbery (F)" with a commitment date of April 2, 1979, in Los Angeles County case No. J545051.

The documents comprising People's exhibit No. 66 included a copy of a probation officer's report, apparently filed April 2, 1979, in the Juvenile Court for the County of Los Angeles, several minute orders, and the Welfare and Institutions Code section 602 petition filed March 1, 1979. The probation report reflects an allegation of "ARMED ROBBERY (211 PC)" and includes a narrative of the underlying facts, describing a robbery by defendant and his companions. The minute order of March 16, 1979, reflects the petition was sustained as to the felony robbery charge.

Fresno County Deputy District Attorney Pat Caples testified that in May 2009 he was assigned to prosecute this matter. Consequently, Caples requested certain documents

---

[9]Over defense counsel's hearsay objection, the exhibit was received into evidence.

from the Los Angeles juvenile court in order to prove defendant's prior criminal conduct. In response, he received a call from a woman in the Los Angeles County clerk's office requesting that he employ a particular Judicial Council form for his request because "an order to unseal juvenile records" was necessary. Caples completed the requested form and later received the documents from the juvenile court in Los Angeles. Caples testified that he received People's exhibit No. 66 in January 2010 in response to his request. Following cross-examination, defense counsel objected as follows: "Object as hearsay. Not a certified document. I would argue it's not admissible for the truth of it without the proper certification." The People argued the documents were admissible because the documents were reliable. Other documents already admitted by the court, including certified documents, bore the same offense date, the California Youth Authority number, and the California Department of Corrections number as the documents comprising People's exhibit No. 66.

The court initially received the documents:

"THE COURT: All right. Well, I believe the documents on their face appear to be records from the LA Superior Court. With the testimony of Mr. Caples and the envelope attached, it is a fair inference that these were provided by the clerk of the court in response to his request. And while they are not certified copies, I believe I have sufficient indicia that they are in fact copies of the records of the Los Angeles court such as to receive them."

Following argument, the court ruled, in pertinent part:

"That takes us to the juvenile prior. Well, first of all, let me say on the subject of the use of the CI&I,[10] I think People v. Martinez at 22 Cal.4th 106 from the California Supreme Court is sufficient support for the proposition that I may consider these other records in assessing the meaning of the records admissible under [section]969b.

---

[10]With regard to People's exhibit No. 64, "a certified copy of the defendant's CI&I," the trial court stated as follows: "Well, I do believe it's admissible as a public record. The accuracy of the document, certainly, is subject to some dispute. So I won't be receiving it and considering it to the extent it may support or further illuminate the convictions alleged that are proved by the [section] 969b packets, and the documents just received."

18.

"I had reviewed that certified copy of the CLETS, Exhibit 64.…
[¶] … [¶] On the issue of the robbery, it certainly does reflect an arrest on or about 12/23/1978 for a robbery. It reflects a petition was requested and some five days later. It then also reflects additional charges in 1979 to which a petition was requested. And then, finally, a conviction in April of '79 for the 211—rather, a true finding for the [section] 211 by the Juvenile Court.

"All robberies are serious felonies. The only remaining question would be his age at the time of the commission of the crime. And I believe that the CLETS records are sufficiently reliable for me to accept, consistent with the description in these records that were not certified by the Los Angeles court that in fact that was the offense date, December 23rd of '78, given [defendant's] birthdate of 11/26/62, he was just under a month past his 16th birthday, which would make that commitment, that finding of the [section] 211 a strike for purposes of the code. Certainly, the records from CYA satisfy me that he was committed for the offense and that it was a [section] 211. And then that satisfies me that that connects sufficiently with the entries on his CI&I to support the conclusion that the offense date was 12/23/78 and that was supported by these other records, albeit uncertified records from the Los Angeles Superior Court.

"Evidence is not perfect as to that because of the uncertified nature of those records. But I think the court can fairly view those as corroborating circumstantial evidence that supports the entries on the CI&I, and can, therefore, conclude that the robbery was committed some time after his 16th birthday and, therefore, qualifies as a serious felony and a strike."

## B.     Analysis

The trial court did not abuse its discretion in admitting court records from the County of Los Angeles to prove defendant had been convicted of robbery, a serious felony, following a 1979 juvenile adjudication.

Trial counsel objected to the admission of the documents offered by the prosecution to prove defendant's juvenile adjudication because the documents were not certified and thus "not admissible for the truth of it without the proper certification." However,

"[u]nder [Evidence Code] section 1530's clear language, certification only establishes a presumption of authenticity and is not the sine qua non of admissibility of official writings. The statute provides that if a copy of an

19.

official writing is properly certified, then the writing 'is *prima facie evidence* of the existence and content of such writing or entry.' ([Evid. Code,] § 1530, subd. (a), italics added; see also … § 969b [certified official records constitute prima facie evidence of prior conviction].) 'Prima facie evidence' is defined as '[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.' (Black's Law Dict. [9th ed. 2009] pp. 638–639.) With proper certification, the copy of the official writing is presumed to be authentic, unless the opponent presents evidence to overcome the presumption that it is a true and correct copy. [Citations.] Indeed, [Evidence Code] section 1530, subdivision (b), clarifies that '[t]he presumptions established by this section are presumptions affecting the burden of producing evidence.' Thus, under [Evidence Code] sections 1530 and 452.5, subdivision (b), a properly certified copy of an official court record is a self-authenticated document that is presumptively reliable, and standing alone may be sufficient to prove a prior felony conviction.

"Since a certified copy of an official writing 'is prima facie evidence of the existence and content of such writing or entry' under [Evidence Code] section 1530, we may infer that a noncertified copy, by itself, is not reliable enough to constitute such prima facie evidence. However, nothing in [Evidence Code] section 1530 forbids authentication by another method. Other evidence may establish that a faxed copy of a certified copy of an official writing is authentic and reliable. When considered together, the evidence may suffice to prove a prior felony conviction." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186-1187.)

In *Skiles*, the prosecutor had presented certified copies of court records from Alabama to prove the defendant had suffered an out-of-state serious felony conviction for purposes of the three strikes law. During trial on the prior convictions, it was determined the copies were incomplete. Over the lunch recess the prosecutor had a single page from the defendant's indictment faxed from the Alabama clerk's office. The trial court admitted the document over the defendant's foundation objection. (*People v. Skiles*, *supra*, 51 Cal.4th at pp. 1181–1182.) Comparing the faxed copy to certified copies of other official court documents that described the offenses, the name of the court and the county and that were from the same date and certified by the same court clerk, the *Skiles* court held "there was sufficient evidence to sustain a finding that the faxed document was an accurate copy of an authentic court record" from Alabama. (*Id*. at pp. 1182, 1188.)

Like *Skiles*, the trial court here compared the noncertified records with other official documents. That comparison established the documents in the objected-to exhibit bore the same Los Angeles case number (J545051) and judicial officer (Fitts), the same commitment date (4/2/79), the same codefendant identities (Guerra & McCollum), and the same offense (robbery). The other certified documents available made the trial court's determination that the noncertified documents were reliable a reasonable determination. Thus, while the documents in People's exhibit No. 66 were not certified, they were not inadmissible. Other evidence spoke to the authenticity of those documents as originating from the Los Angeles Superior Court.

Further, the official records exception to the hearsay rule, embodied in Evidence Code section 1280, provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (See *People v. Martinez* (2000) 22 Cal.4th 106, 119–120.) "A trial court has broad discretion in determining whether a party has established these foundational requirements. [Citation.]" (*Id*. at p. 120.) A reviewing court may overturn the trial court's exercise of discretion "'"only upon a clear showing of abuse."'" [Citations.]" (*Ibid*.)

Here, a review of the documents comprising People's exhibit No. 66 establishes the documents meet the requirements of Evidence Code section 1280, the official records exception to the hearsay rule. The documents were plainly made by and within the scope of a public employee's duty as those documents are (1) a signed probation officer's report file-stamped with a date of April 2, 1979, also bearing the caption "Superior Court of California County of Los Angeles Juvenile Court" and case No. J545051; (2) a two-page judicial-form minute order dated "4-2-79" bearing the same caption and case number;

21.

and (3) a Welfare and Institutions Code section 602 petition, bearing the same caption and case number, and file-stamped March 1, 1979.

Defendant's arguments are simply unavailing. The trial court did not abuse its discretion. It properly admitted and considered the documents comprising People's exhibit No. 66 in finding defendant suffered a prior serious felony adjudication for robbery as a juvenile.

## IV.     The People's Request for Remand for Resentencing

In a footnote in their appellate brief, the People request this matter be remanded for resentencing, contending the trial court intended to impose a sentence of "25 years to life for count one, plus a determinant term of 21 years for the enhancements" because defendant could not have been sentenced to both a term of 25 years to life and an upper term of five years on count one. Defendant fails to address this issue in his reply brief.

After noting defendant was statutorily ineligible for probation, the court stated the following:

> "[THE COURT:] And the Court will fix as the base term in this case, as recommended by the Probation Office as well, will fix Count One as the base term in this matter, namely, a violation of … Section 211. And as the report reflects, and the Court concurs, after I state the term fixed for the base term in Count One, I'll state now and I'll repeat again, that Counts Two and Counts Three, namely, … Section 245(a)(2) in Count Two, and … Section 422 as reflected in Count Three, the order the Court will make as to those counts will be stayed pursuant to … Section 654.

> "And, finally, when the Court addresses Count Four, a violation of … Section 12021(a)(1), that as recommended by the Probation Officer, and the Court concurs, Count Four will be ordered to run concurrently or together with the term referenced in Count One.

> "So with reference to Count One, which will be fixed as the base term in this case, first, weighing the factors in mitigation versus those in aggravation, the factors in aggravation clearly preponderate. Noting that Defendant has not led a legally blameless life. And his convictions have been continuous and numerous up to and including the date of this offense. And Defendant has not successfully completed parole or probation on many, many previous cases.

22.

"And, of course, the outstanding factor in aggravation in this case is the great threat of violence that this case posed to the victim in this case, the great threat of violence and the planning and sophistication that led up to the offense that took place on that date.

"So the Court will find, therefore, that the aggravation—aggravated term of five years will be fixed—initially in terms of judgment and sentence, the aggravated term of five years. Of course, for the offense, in light of the fact that he has prior strikes, the Defendant will be committed to state prison for the term of 25 years to life.

"Now, with respect to the enhancements in this case, Defendant will be ordered to serve an additional and consecutive ten-year term pursuant to … Section 12022.53, subdivision (b), and an additional ten years for two of the prior serious felonies, pursuant to … Section 667(a)(1), for an additional enhancement of ten years, and further an enhancement of one year for the prior conviction for [section] 667.5(b)(1), for a total determinate sentence of ten years, plus ten years, and one year for the 667.5, and of course the aggravated term of five years for the robbery, which equates to 26 years.

"So, accordingly, in light of the enhancements the Court has found, plus the aggravated term, Defendant will be committed to the Department of Corrections for the term of 26 years to life as the base term for Count One. Again, 26 years to life. And, of course, that 26 years to life consists of the enhancements previously stated that will be ordered."

A short time later, the following colloquy occurred:

"[PROSECUTOR]: Just so my notes are clear, it's a total term of 21 years determinate, followed by a consecutive term of 26 years to life?

"THE COURT: That's the Court's order.

"[PROSECUTOR]: Thank you, Your Honor. [¶] … [¶]

"[DEFENSE COUNSEL]: Your Honor, there was one question I had, which was not disputing the Court's sentence, it just has to do with the calculation of it. Wouldn't it be 25 years, plus 21 determinate?

"THE COURT: The record will speak for itself, Counsel."

The minute order of the sentencing proceeding states a determinate term of 21 years was imposed alongside an indeterminate term of 26 years to life. The abstract of judgment

23.

provides an indeterminate term of 25 years to life was imposed, and reflects a determinate term of 26 years.[11]

Typically, where an abstract of judgment and the court's oral pronouncement are at odds, we direct the trial court to amend the abstract of judgment to comport with the sentence orally imposed. (*People v. Delgado*, *supra*, 43 Cal.4th at p. 1070 [when oral pronouncement of judgment conflicts with abstract of judgment, oral pronouncement prevails]; *People v. Mitchell* (2001) 26 Cal.4th 181, 187 [Court of Appeal may correct errors in abstract of judgment].) Although the court's oral pronouncement in this case is somewhat confusing, the correct result is stated in the minute order.

As noted above, the trial court stated it was imposing an "aggravated term of five years" then also stated defendant would "be committed to state prison for the term of 25 years to life" on the same count. The court went on to impose and calculate the applicable enhancements totaling 21 years.[12] But then it added another five years for the base robbery term to that figure. The confusion is evidenced by the request for clarification by the prosecutor, followed shortly thereafter by an inquiry from defense counsel.

Given the underlying violent felony and the two qualifying prior strike convictions here, the trial court was required to impose the greatest life term calculated pursuant to section 667, subdivision (e)(2)(A)(i) through (iii). (*People v. Dotson* (1997) 16 Cal.4th 547, 552-554.) It is apparent the court intended to impose its sentence pursuant to option (iii) as that calculation would result in a total of 26 years to life. This life term is greater than option (i), 15 years to life, or option (ii), 25 years to life. Consequently, we conclude the sentence reflected in the minute order, 26 years to life consecutive to a

---

[11]More specifically, the abstract of judgment reflects an indeterminate term of 25 years to life on count 4. It also reflects a determinate term of 26 years, composed of a five-year base term on count 1 and a total of 21 years for the various enhancements.

[12]I.e., 10 years (§ 12022.53, subd. (b)) + 10 years (§ 667, subd. (a)(1)) + 1 year (§ 667.5, subd. (b)(1)) = 21 years.

determinate term of 21 years for the enhancements, is the appropriate sentence. Therefore, we will order a correction of the abstract of judgment.

## DISPOSITION

The trial court is directed to correct the abstract of judgment to reflect its sentence of an indeterminate term of 26 years to life consecutive to a determinate term of 21 years. The clerk of the superior court is to serve a certified copy of the corrected abstract of judgment on the appropriate parties and agencies. Otherwise, the judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:

_____

POOCHIGIAN, Acting P.J.

_____

FRANSON, J.

25.